# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **PROTRADENET, LLC** | § | |
| | § | |
| *Plaintiff.* | § | |
| | § | **Consolidated** |
| v. | § | **Civil Action No. 6:18-CV-38-ADA** |
| | § | |
| **PREDICTIVE PROFILES, INC.** | § | |
| | § | |
| *Defendant.* | § | |

| | | |
|---|---|---|
| **PREDICTIVE PROFILES, INC.** | § | |
| | § | |
| *Plaintiff.* | § | |
| | § | |
| v. | § | |
| | § | |
| **PROTRADENET, LLC AND DWYER** | § | |
| **FRANCHISING, LLC,** | § | |
| | § | |
| *Defendants.* | § | |

**PROTRADENET'S AND DWYER'S PROPOSED FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiff ProTradeNet, LLC ("PTN" herein) and Counter-Plaintiff Dwyer

Franchising, LLC ("Dwyer" herein) file this Proposed Findings of Fact and Conclusions of Law in

accordance with Local Rule CV-16(e)(8).

**PROPOSED FINDINGS OF FACT**

1.      In February 2017, PTN and its Trading Partners entered into a DISTRIBUTOR

VENDOR RELATIONS AGREEMENT (the "Agreement" or "PTN Agreement") with Predictive

Profiles, Inc. ("Predictive"). Luke Stanton, President of PTN, signed the Agreement on February 23,

2017, on behalf of PTN.  Carla Bainbridge, President and CEO of Predictive, signed the Agreement

on February 21, 2017, on behalf of Predictive. Mary Thompson, COO of Dwyer, was heavily involved in the negotiation of and performance of the PTN Agreement.

2.      Predictive is specifically listed as a "non-exclusive preferred vendor" in the PTN Agreement.

3.      PTN provides various services to various separate franchise brands, which are subsidiaries of Dwyer, and those brands are referred to as "Trading Partners" in the Agreement. Those Trading Partners are listed in EXHIBIT "B" to the PTN Agreement, which is part of the Agreement. Independently owned and operated franchisees of each Trading Partner are referenced under the Agreement as "Contractors."

4.      PTN is a Dwyer subsidiary (Dwyer changed its public name to Neighborly last year) whose role generally is to provide a wide range of options that may benefit franchisees, ranging from cheaper sources of supplies to new technologies and third-party services.  In the case of Predictive, the hoped-for benefit was access to more qualified employees and easier hiring processes. PTN accomplishes its role by researching best practices and qualified vendors for products and services that may be of benefit to franchisees, then selecting "Preferred Vendors." A Distributor Vendor Relations Agreement is then signed establishing the relationship between PTN and the Preferred Vendor.  The Preferred Vendors are made known to franchisees as determined by each individual Dwyer brand, and if selected by that brand, the Preferred Vendor is afforded access to franchisees through direct communications and events such as conventions and training sessions.

5.      If selected by a brand, franchisees are not required to use Preferred Vendors. Franchisees are simply made aware of their goods and services, including things like cheaper pricing and vendor rebates. Preferred Vendors are generally non-exclusive, meaning PTN may have multiple Preferred Vendors for the same or similar product or service.  The contracts are generally terminable by either party for no cause within ninety (90) days

6.     The PTN Agreement in this case was terminable, with or without cause, by either party, upon at least ninety (90) days advance written notice of the party's intent to terminate the Agreement.

7.     Within each category of goods or services, the establishment of agreements with multiple Preferred Vendors, and the ability to readily add and remove vendors as needed, is seen as essential to keep the marketplace competitive and to provide franchisees with various options and alternatives for how they want to run their independently owned and operated franchise business. This framework supports PTN's position in not entering into exclusive agreements. The resulting competitive marketplace thus allows franchisees options, while maintaining a certain level of accountability with vendors to ensure best possible pricing and service.  All of this is well known to everyone involved, from franchisees to brands to vendors, and vendors entering the system accept this framework. In the end, it is up to the Preferred Vendor to earn the business of each brand and franchisee.

8.     Pursuant to the Agreement, PTN granted Predictive an opportunity, in a non-exclusive relationship, to market and promote Predictive's products and services to the Trading Partners and Contractors who elected to participate. Predictive was specifically designated as a "non-exclusive preferred supplier," and PTN provided franchisees with information and recommended and encouraged franchisees to use the services of Predictive. PTN also afforded Predictive better and easier access to franchisees than would be the case with a non-Preferred Vendor.  The Agreement specifically provided that there were no quotas or minimum number of sales or inquiries pertaining to the Program.  There were no guarantees.

9.     As part of the Agreement, PTN allowed Predictive limited rights to display the PTN and participating Trading Partner trademarks and logos.  Such use was subject to written or e-mail approval from PTN or the participating Trading Partner. The Agreement provides that Trading

Partners may be added or removed at any time. The Agreement states that Predictive will receive written or e-mail notification of a change, but does not state that that notice must be in advance of removal or addition.

10.     Predictive's system was not initially widely implemented. Bainbridge stated to Thompson that "without a tighter integration with Indeed[.com], we may have a failed business model."[1]

11.     At some point following implementation of Predictive's system and utilization of the Indeed.com website in connection with Predictive's job postings, there was unrest among franchisees, something acknowledged by Predictive – in connection with this litigation, Bainbridge made a sworn declaration that "Contractors were inundated with applicants and we learned there was unrest in the various Trading Partner's systems."[2]

12.     There were also additional concerns regarding Predictive's platform, such as its inability to target a specific franchisee's local employment needs.

13.     Franchisees complained to their respective brands, Dwyer, and/or PTN.

14.     One example of the type of complaints received is that an existing franchisee's employee would see that their own job was being advertised as open – although it was not –leading that employee to believe that they were about to be fired and replaced.  There were also complaints because prospective employees were being told that job openings existed when they did not, which meant that whenever a job vacancy actually needed to be filled, that prospective employee might believe there was no real opening as had been their prior experience.  Franchisees that had not signed up with Predictive were also getting unsolicited and unwanted employees directed to them – and also received unwanted communications from Predictive as a result (for example, a frequent complaint

---

[1] PP_00960 – PP_00963.
[2] ECF 63-1 at 5.

was that Predictive was calling the franchisees telling them to sign on so they would be charged).  The problems and complaints grew so numerous that individual and system-wide notices to franchisees had to be issued to assure franchisees that these problems were being worked on to solve the problems.

15.     After further review, PTN decided to issue a Request for Proposal (RFP) that would solicit additional employment vendors who could solve these problems and provide additional options to franchisees for employment issues, including an alternative applicant tracking option.

16.     However, while additional options were being pursued, one of the requirements of this RFP was that the new vendor specifically would have to be able to integrate with Predictive's platform and its assessment tool. The RFP makes clear, in writing, that PTN was not trying to stop working with Predictive, but rather, insisting on keeping Predictive within the Preferred Vendor network.[3]

17.     Though not known to PTN and Dwyer at this time, Predictive was having business troubles throughout this time and considered its business model experimental.

18.     Carla Bainbridge was invited to a meeting with CareerPlug in April 2017, which she attended. After this meeting, Mary Thompson asked Bainbridge if Predictive could make changes to its platform to satisfy these growing concerns presented by franchisees, including posting individual jobs and customizing job descriptions. The level of complaints were so high that Predictive even had to remove the Customer Service Representative position for MRE. This request was rejected because Bainbridge informed Thompson that Predictive's systems could not be customized. Given this, Dwyer and PTN decided to move forward with the RFP for an ATS that would integrate Predictive Profiles. Predictive was still invited to submit an RFP, but chose not to do so.

---

[3] See PP_00968 – PP_000974, PP_02725, PP_02727 – PP_02735.

**Proposed Findings of Fact and Conclusions of Law**                                    **Page 5 of 32**

19.     Initially, Bainbridge expressed that Predictive was fully on board, even sending Thompson e-mails regarding how to integrate Predictive with the chosen ATS. However, after PTN actually selected CareerPlug as an ATS option, Bainbridge stopped returning phone calls and/or responding to e-mails despite repeated attempts. When she finally got back in touch, she then began threatening to take all her career portals down and saying she would just walk away.

20.     At the 2017 Reunion event hosted by Dwyer, franchisees were introduced to CareerPlug as a vendor. Franchisees were told that they could continue to use Predictive if they chose.

21.     Franchisee complaints regarding Predictive's open-source job posting were ongoing and the push to Indeed.com created confusion for actual job postings.

22.     Indeed.com told Dwyer it could only elect one ATS. CareerPlug was chosen. The PTN Agreement does not reference or mention Indeed.com.

23.     By letter dated October 2017, Predictive notified PTN that Predictive and PTN were in a "partnership" and that PTN was in breach of the Agreement. By letter dated January 4, 2018, PTN's attorney made clear that, while Predictive had terminated the agreement by prior e-mails, PTN was open to continuing a relationship and advised Predictive's counsel that franchisees could still use Predictive's services. Predictive's attorney then appeared to state that Bainbridge hadn't terminated the agreement (though her e-mails are clear) and accused PTN of being in breach. PTN disputed this assertion and litigation commenced between the parties.

24.     Predictive removed the case and simultaneously filed a new lawsuit against both PTN and Dwyer.  The two lawsuits are now consolidated.

25.     This Court dismissed Predictive's claims of tortious interference with existing contracts against Dwyer[4] and gave Predictive the opportunity to replead because Predictive had failed

---

[4] ECF 47 at 10.

to allege independently tortious acts.[5] In response, Predictive amended its complaint and made the unsupported allegation that PTN told franchisees that they "may not use Predictive's services whatsoever." As to Predictive's claims against PTN for tortious interference with existing contracts, this Court ordered that Predictive identify what third-party franchisee contractors Predictive was referring to.

26.     Even after the Agreement was terminated, franchisees were specifically told "you have the option to continue to use [Predictive]."[6]

27.     The Agreement's effective date is when it was signed by PTN[7] on February 23, 2017.[8]

28.     PTN's ability to provide franchisees options with the Indeed.com website (a top national recruiting platform) was jeopardized by Predictive's non-cooperation,[9] and disruption of PTN's relationship with Indeed.com continues at the present time due to ongoing actions by Predictive.[10]

29.     In a sworn declaration, Bainbridge admitted that there are no contracts between Predictive and franchisees: ""There is never any commitment on the part of franchisees to accept Predictive's services: they may cancel at any time, or resume service, by providing credit card information and agreeing to our Terms of Service via a web-based interface."[11]

30.     The Parties agreed to a Preliminary Injunction on December 4, 2018.[12] Predictive violated this Preliminary Injunction.[13]

---

[5] ECF 47 at 11.
[6] PTN 001726.
[7] *Id.* at ¶ 8.9.
[8] *Id.*
[9] *Id.*
[10] See ECF 70.
[11] ECF 63-1 at 4 (emphasis added).
[12] ECF 42.
[13] ECF 97.

31.     At the time the PTN Agreement was signed, Dwyer Group was the holding company for eleven (11) franchise brands in the home services industry. The number is now thirteen.  Each brand has its own business entity that operates as a franchisor.

32.     Dwyer Group has offered and sold goods and services in United States commerce for many years under several federally registered trademarks, including MR. ROOTER, RAINBOW INTERNATIONAL, MR. APPLIANCE, MR. ELECTRIC, AIRE SERV, FIVE STAR PAINTING, WINDOW GENIE, THE GROUNDS GUYS, AND GLASS DOCTOR (collectively, the "Dwyer Marks").

33.     Dwyer Group has offered and sold goods and services in United States commerce for many years and in some cases decades under several federally registered trademarks, including MR. ROOTER, RAINBOW INTERNATIONAL, MR. APPLIANCE, MR. ELECTRIC, AIRE SERV, FIVE STAR PAINTING, WINDOW GENIE, THE GROUNDS GUYS, AND GLASS DOCTOR.

34.     For example, the Dwyer Group has used the MR. ROOTER mark since at least as early as 1969.  It has used the GLASS DOCTOR mark since at least as early as 1976.  The Dwyer Group has used the MR. ROOTER, RAINBOW INTERNATIONAL, MR. APPLIANCE, MR. ELECTRIC, AIRE SERV, FIVE STAR PAINTING, WINDOW GENIE, THE GROUNDS GUYS, AND GLASS DOCTOR marks continuously in United States commerce for many years and well before the Defendant's use.

35.     Dwyer Group has offered and sold goods and services under the MR. ROOTER, RAINBOW INTERNATIONAL, MR. APPLIANCE, MR. ELECTRIC, AIRE SERV, FIVE STAR PAINTING, WINDOW GENIE, THE GROUNDS GUYS, AND GLASS DOCTOR marks throughout the United States via its franchisees and through associated web sites. Dwyer Group has also advertised the goods and services on radio, T.V., print magazines, trade shows and social media.

36.     Dwyer Group has invested substantial time, effort and financial resources promoting its MR. ROOTER, RAINBOW INTERNATIONAL, MR. APPLIANCE, MR. ELECTRIC, AIRE SERV, FIVE STAR PAINTING, WINDOW GENIE, THE GROUNDS GUYS, AND GLASS DOCTOR  marks in connection with the marketing and sale of its goods and services. As a result, these trademarks have become, through widespread and favorable public acceptance and recognition, an asset of substantial value as a symbol of Dwyer, its quality products and its goodwill.

37.     The Dwyer Marks are arbitrary and fanciful marks that are entitled to the highest level of protection afforded by law.

38.     The Dwyer Marks are associated with each of the franchised brands in the minds of consumers, the public, and the trade.

39.     Dwyer Group owns and maintains websites associated with each trademark. Dwyer Group uses these websites to promote each brand. Dwyer Group spends significant resources to advertise and promote itself, the brands, and trademarks on the Internet via its website and search optimization. For example, in 2018, Dwyer Group spent $10.4 million. This includes paid search advertising, web banner advertising, website content creation and maintenance, and other web activities.

40.     Dwyer Group promotes its service nationally and locally via a variety of mediums such as T.V., radio, and print. For 2018, Dwyer Group spent approximately $5.8 million in national and local advertisements. Dwyer Group also uses social media as a marketing channel. For example, Dwyer Group uses Facebook as a marketing channel to attract customers and others (e.g., potential franchisees and potential employees/contractors for its franchisees). For the MR. ROOTER mark, Dwyer uses the page <facebook.com/MrRooterLLC>. Current and potential customers can use the page to learn of services offered under the MR. ROOTER mark, locations, and even book an appointment.

41.     Dwyer Group also has Yelp pages for its wholly owned brand franchises. Dwyer uses Yelp as a marketing channel to attract customers and others (e.g., potential franchisees and potential employees/contractors for its franchisees). Current and potential customers can use the page to learn about the services offered under the MR. ROOTER mark, locations, and even book an appointment.

42.     Dwyer has also invested substantial time, effort and financial resources promoting its MR. ROOTER, RAINBOW INTERNATIONAL, MR. APPLIANCE, MR. ELECTRIC, AIRE SERV, FIVE STAR PAINTING, WINDOW GENIE, THE GROUNDS GUYS, and GLASS DOCTOR marks in connection with the marketing and sale of its goods and services. Dwyer advertises the goods and services on radio, T.V., print magazines, trade shows and social media. These branded goods and services have been featured in dozens of newspaper and magazine articles. For 2018, Dwyer spent approximately $5.8 million in "brand management" expenses to promote these marks and brands on T.V., radio, and print advertisements.  Dwyer's spending in 2019 is on similar pace.

43.     Dwyer also promotes its brands and marks on the Internet.  Dwyer owns and controls domain names and associated websites for each brand and uses these domain names and websites to promote each brand.  Dwyer spends significant resources to advertise and promote itself and the franchise brands and trademarks on the Internet via its website and search optimization. For example, in 2018 Dwyer spent $10.4 million on "strategic services" expenses, which includes activities such as paid search advertising, web banner advertising, website content creation and maintenance, and other web activities.  Dwyer's spending in 2019 is on similar pace.

44.     Dwyer also uses social media as a marketing channel. For example, Dwyer uses Facebook as marketing channel to attract customers and others (e.g., potential franchisees and potential employees/contractors for its franchisees).  For the MR. ROOTER mark, Dwyer uses the <facebook.com/MrRooterLLC>>. Current and potential customers can use the page to learn about

the services offered under the MR. ROOTER mark, locations, and even book an appointment.  Another social media channel used by Dwyer to promote its brand and marks is Yelp. Dwyer uses Yelp as a marketing channel to attract customers and others (e.g., potential franchisees and potential employees/contractors for its franchisees).  Current and potential customers can use the page to learn about the services offered under the MR. ROOTER mark, locations, and even book an appointment. Dwyer spent $151,515 for the year in 2018 on social media for the nine brands whose marks are at issue in this case.  Dwyer's spending in 2019 is on similar pace.

     45.     Thus, in total for 2018, spent at least an average of $1.34 million per month or $16.1 million for the year in 2018 to advertise and promote its wholly-owned brand franchises. For 2019, Dwyer, has spent a similar amount per month, or approximately $9,380,000.

     46.     Below are Dwyer's total advertising expenditures for the marks at issue:[14]

| | | |
|---|---|---|
| ASV | US | $798,386 |
| FSP | US | $708,030 |
| GUY | US | $328,643 |
| MDG | US | $831,760 |
| MRA | US | $727,459 |
| MRE | US | $470,395 |
| MRR | US | $2,203,105 |
| RBW | US | $821,046 |
| WDG | US | $118,455 |
| | | $7,007,279 |

---

[14] The following is the key to the acronyms used above:
Aire Serv – ASV
Five Star Painting – FSP
The Grounds Guys – GUY
Glass Doctor – MDG
Mr. Appliance – MRA
Mr. Electric – MRE
Mr. Rooter – MRR
Rainbow International – RBW
Window Genie – WDG

47.     The Dwyer Marks identify high quality products originating with the Dwyer Group's franchise brands.

48.     Based upon the Dwyer Group's extensive advertising, sales, and the wide popularity of products and services, the Dwyer Marks have acquired secondary meaning so that any product or services and advertisement bearing such marks is immediately associated by consumers, the public, and the trade as being a product and affiliate of the Dwyer Group.

49.     The Dwyer Group has gone to great lengths to protect its Dwyer Marks and enforce the Dwyer Marks.

50.     The Dwyer Marks are in full force and effect and have become incontestable pursuant to 15 U.S.C. § 1065.

51.     After the Agreement was terminated, PTN sent Predictive a notice that it was no longer authorized to use the Dwyer Marks on webpages it had been operating as part of its services and it was to disable or terminate the domain names that utilized the marks as well.   At the time, Predictive was using each of the eleven (11) Dwyer Marks in several URLs (e.g., http://applyataireserv.com).

52.     Rather than ceasing to use the Dwyer Marks, taking down the URLs, and discontinuing use of the domains after it no longer had contractual rights to use Dwyer's Marks, Predictive registered new URLs and then "redirected" all traffic from prior URLs to new ones. For example, if one typed the domain "applyatmrrooter.com," that person would be redirected to Predictive's new domain, "applyforplumbingjobs.com," and the content on these new domains still used the Dwyer Marks without permission. As a result, Predictive was using and profiting from the registered trademarks without license or consent. Even after being ordered to turn over the infringing URLs and to cease to use Dwyer's marks, Predictive continues to use the new domains and infringe Dwyer's trademarks.

53.     Predictive's acts after the Agreement was terminated were intentional and calculated to confuse and to deceive the consumers, the public and the trade and were performed with full knowledge of the Dwyer Group's rights.

54.     After the Agreement was terminated, Predictive was no longer associated, affiliated or connected with, or endorsed or sanctioned by the Dwyer Group.

55.     After the Agreement was terminated, the Dwyer Group has never authorized or consented in any way to the use by Predictive of the Dwyer Marks or copies thereof.

56.     The use by Predictive of the Dwyer Marks or copies thereof on Predictive's products and services is likely to cause consumers, the public, and the trade to believe erroneously that the goods or services offered or sold by Predictive emanate or originate from the Dwyer Group, or that said items are authorized, sponsored, or approved by the Dwyer Group, even though they are not.

57.     This confusion causes irreparable harm to the Dwyer Group and weakens the distinctive quality of the Dwyer Marks.

58.     By using infringements of the Dwyer Marks on Predictive's goods and services, Predictive is trading on the goodwill and reputation of the Dwyer Group and creating the false impression that Predictive's goods and services are the Dwyer Group's legitimate products and services.

59.     Predictive has been unjustly enriched by illegally using and misappropriating the Dwyer Group's intellectual property for Predictive's own financial gain.

60.     Furthermore, Predictive has unfairly benefited and profited from the Dwyer Group's outstanding reputation for high quality products and services, and its significant advertising and promotion of the Dwyer Group products and services and the Dwyer Marks.

61.     Predictive has disparaged the Dwyer Group, the Dwyer Marks, and its products and services by creating a false association with the Dwyer Group, its genuine goods and services, and the Dwyer Marks.

62.     The Dwyer Group has had no control over the nature and quality of the products and services sold by Predictive bearing infringements of the Dwyer Marks.

63.     Among other things, Predictive's distribution, sale, offers of sale, promotion and advertisement of its products and services has reflected adversely on the Dwyer Group as the believed source of origin thereof, hampered continuing efforts by the Dwyer Group to protect its outstanding reputation for high quality, originality and distinctive goods and services, and tarnished the goodwill of the Dwyer Marks to consumers, the public, and the trade, and, unless restrained, will continue to do so.

64.     After the Agreement was terminated, rather than taking down the domain names and cease using the registered trademarks, Predictive instead registered new domains and then "redirected" all traffic from the domains using the eleven (11) franchise brands' trademarks to the new domains. For example, if one typed the domain "applyatmrrooter.com," that person would be redirected to Predictive's new domain, applyforplumbingjobs.com.  As a result, Predictive was using and profiting from the registered trademarks without license or consent by using the domains.  Predictive has turned over some of the domains using the eleven (11) franchise brands' trademarks to Dwyer after being ordered to do so by the Court in this case.  However, Predictive continued to use the new domains as discussed below.

65.     The webpages Predictive created, posted, and continues to operate for the new domains it registered use the registered trademarks without license or consent. That is, Predictive operated at least eleven (11) new domains using the franchise brands' trademarks on the webpages without consent or license.  These domain names do not resolve to websites owned, controlled or

endorsed by Dwyer. Instead, they resolve to websites that are owned and controlled by Defendant. Below are reproductions of the webpages from these new domains:

http:www.applyforhvacjobs.com



http://applyforglassrepairjobs.com/



http://www.applyforgoundskeeperjobs.com/



http://applyforwindowcleaningjobs.com/







http://www.applyforpaintingjobs.com/



http://www.applyforelectriciancareers.com/



http://www.applyforappliancerepairjobs.com/



http://www.applyforplumbingjobs.com/



http://applyforrestorationjobs.com/



66.     Predictive has acted with reckless disregard for the Dwyer Group's rights or was willfully blind in connection with its unlawful activities.

67.     Predictive has willfully and maliciously engaged in its infringing activities.

68.     As a result of the foregoing, this case constitutes an exceptional case as defined by 15 U.S.C. § 1117(a).

69.     As a result of the foregoing, the Dwyer Group must engage in extensive corrective advertising once Predictive's infringing activities have been restrained by the permanent injunction issued below.

70.     Given Predictive's ongoing infringement and violation of the Court's preliminary injunction, it was reasonable for the Dwyer Group to refrain from any corrective advertising until Predictive's infringing activities have ceased.

71.     The Dwyer Group has suffered irreparable harm and damages as a result of the acts of Predictive.

72.     The injuries and damages sustained by the Dwyer Group have been directly and proximately caused by Predictive's wrongful advertisement, promotion, distribution, sale and offers of sale of their goods and services bearing infringements of the Dwyer Marks.

## PROPOSED CONCLUSIONS OF LAW

PTN's Breach of Contract Claim

73.     Under Texas law, the elements of breach of contract are: "(1) the existence of a contract; (2) performance or tendered performance by the plaintiff; (3) breach by the defendant; and (4) damages sustained by the plaintiff as a result of the breach."[15]

74.     There is no dispute regarding the existence of the PTN Agreement.

75.     PTN performed under the PTN Agreement.

76.     Predictive breached the Agreement by (1) utilizing trademarks following termination of the PTN Agreement; and (2) posting jobs for franchisees where no jobs existed and for franchisees with whom it did not have a written agreement.

77.     PTN has suffered damages as a result of Predictive's breach.

78.     The PTN Agreement entitles PTN to attorneys' fees.

Predictive's Breach of Contract Claim

79.     Predictive's claims are barred by the Parol Evidence Rule.

80.     As stated above, the PTN agreement provides that "(1) there are no quotas, (2) the agreement is non-exclusive by its very terms, and (3) the only obligation in the Agreement is that PTN let its franchisees know about Predictive's platform and nothing else."

81.     Predictive states that there was a goal of 75% market penetration and its damages stemmed from the failure to reach that goal.[16] Predictive also states that PTN breached the Vendor

---

[15] *Id.*

[16] *E.g.,* ECF 49 at 20 ("Predictive had a reasonable probability of entering into new service agreements with the various Trading Partners' Contractors based on Neighborly and ProTradeNet's expressed

Agreement by failing to perform as set forth in Paragraph 35 and by encouraging franchisees to use a direct competition for Predictive.[17] This requires variance from the Agreement, because the Agreement is non-exclusive, which means that there will be other vendors. Moreover, the agreement specifically provides that PTN's sole obligation is to let its franchisees "know of [Predictive's platform] and nothing else."[18]

82.     Predictive's damage model is based on an alleged quota and that Predictive's claims are based on alleged prior agreements or statements that conflict with the PTN Agreement. Moreover, the Agreement itself states that "This Agreement sets forth the entire Agreement and understanding between the parties as to the subject matter hereof, and merges and supersedes all prior discussions, agreements and understandings of every and any nature between the parties."[19]

83.     Even if Predictive's claims were not barred by the Parol Evidence Rule, Predictive has not presented legally sufficient evidence of lost profits.

84.     The Texas Supreme Court has held that "lost profits damages can be recovered only when both the fact and amount of damages is proved with reasonable certainty."[20]

---

commitment to a goal of 75% market penetration, as well as the rapid adoption of its services by hundreds of Contractors via the "applyatsites.").

[17] ECF 49 at 18.  It is unclear what Predictive intends by reference to Paragraph 35. That paragraph does not refer to any alleged breach by PTN.

[18] PTN Agreement at ¶ 2.3 (emphasis added).

[19] PTN Agreement at ¶ 8.1.

[20] *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848 (Tex. 2017)(citations omitted)(" A party's bare assertion that a contract was lost does not establish lost profits with reasonable certainty. Rather, the general rule is that recovery of lost profits as damages is allowed "where it is shown that a loss of profits is the natural and probable consequence of the act or omission complained of, and their amount is shown with sufficient certainty." However, "anticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated." Indeed, "[t]he law is wisely skeptical of claims of lost profits from untested ventures or in unpredictable circumstances, which in reality are little more than wishful thinking." … "When the evidence supporting a claim for lost profits damages is largely speculative or a mere hope for success, lost profits have not been established with reasonable certainty.").

85.    Additionally, the Fifth Circuit has held that "Parties cannot recover anticipated profits when 'there is no evidence from which they may be intelligently estimated.' Those profits must be ascertainable with a reasonable degree of certainty based on objective facts, figures, or data."[21]

86.    There are no objective facts, figures, or data supporting Predictive's damage model and request for lost profits.

<u>Predictive's Tortious Interference with Existing Contracts Claim</u>

87.    In order to establish tortious interference with contract, Predictive must demonstrate "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with that contract, (3) which caused plaintiff's injury, and (4) resulted in actual damages or loss."[22]

88.    Predictive has failed to establish the existence of a contract subject to interference based on Predictive's admission that there are no contracts between Predictive and the franchisees. "A cause of action for tortious interference with a contract will not lie in the absence of a contract."[23]

89.    Predictive cannot recover on its claim because PTN would not be a stranger to any contracts between Predictive and Dwyer franchisees if any contracts existed.

<u>Predictive's Tortious Interference with Prospective Contracts Claim</u>

90.    In order to prevail on a claim for tortious interference with prospective contracts/prospective business relations, Predictive must establish the following: "(1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring

---

[21]  *Al-Saud v. Youtoo Media, L.P.*, 754 Fed. App'x 246, 255 (5th Cir. Oct. 22, 2018)(citations omitted)(quoting *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994)).
[22]  *Wells v. Bank of Am., N.A.*, No. A-12-CA-409 LY, 2012 U.S. Dist. LEXIS 192601, at * 20-21 (W.D. Tex. Nov. 9, 2012).
[23]  *Rimkus*, 688 F. Supp. 2d at 674. See also *S&A Marinas v. Leonard Marine Corp.*, 875 S.W.2d 766, 769 (Tex. App.—Austin 1994, writ denied)("It is axiomatic that a cause of action for tortious interference with a contract will not lie in the absence of a contract. If a trial court can determine conclusively that no contract exists, summary judgment is appropriate.")(citations omitted)(emphasis added).

or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result."[24]

91.     Predictive cannot prevail on its claim because Dwyer and PTN are not strangers to the alleged prospective contracts. "Texas jurisprudence has long recognized that a party to a contract has a cause of action for tortious interference against any third person (a stranger to the contract) who wrongly induces another contracting party to breach the contract. By definition, the person who induces the breach cannot be a contracting party. Were we to recognize the tortious interference claim when this identity of interest exists, any party who breaches a contract could be said to have induced his own breach and would therefore be liable for tortious interference. Such logic would convert every breach of contract claim into a tort claim."[25]

92.     Under Texas law, a claim for tortious interference with a prospective contract requires pleading and proof that a party committed an independently tortious act.[26] While not meaning that a plaintiff must prove an independent tort, it does mean that "plaintiff must prove 'that the defendant's conduct would be actionable under a recognized tort.'"[27] Predictive has failed to establish that Dwyer and PTN committed any independently tortious act. "Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations…"[28]

---

[24] *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

[25] *Holloway v. Skinner*, 898 S.W.2d 793, 794-95 (Tex. 1995)(emphasis added)(citations omitted). See also *In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 761 (Tex. 2006)("Thus, while liability for tortious interference arises from the general law, *nonliability* arises from connections with the contract.")(emphasis in original).

[26] *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001)(holding that "… to recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's conduct was independently tortious or wrongful.").

[27] *Seismic Wells, LLC v. Matthews*, No. 5:15-CV-148-C, 2015 U.S. Dist. LEXIS 179059, *18 (N.D. Tex. Sept. 11, 2015)(quoting *Wal-Mart*, 52 S.W.3d at 726)).

[28] *Wal-Mart*, 52 S.W.3d 711, 726 (Tex. 2001).

93. Predictive has also failed to identify the prospective contracts in question with reasonable certainty. Predictive failed to present *any* prospective contracts.

94. Predictive has failed to establish that there was a reasonable probability that it would have entered into any contracts with franchisees.[29] Predictive has filed sworn declarations that it does not have any contracts with franchisees.

Dwyer's Lanham Act Claims

95. To prevail on a claim of federal trademark infringement under the Lanham Act, 15 U.S.C. § 1051 et seq., a plaintiff must show (1) ownership of a legally protectable mark and (2) a likelihood of confusion created by an infringing mark.[30] Under the Lanham Act, a person "shall be liable in a civil action" by the registrant of a mark if the person, without the registrant's consent, "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]"[31] The Fifth Circuit considers the following eight nonexhaustive "digits" to assess likelihood of confusion: (1) strength of the mark; (2) mark similarity; (3) product or service similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers.[32]

---

[29] To show reasonable probability, "it is not necessary to prove that the contract would have certainly been made but for the interference; it must be reasonably probable, considering all of the facts and circumstances attendant to the transaction. More than mere negotiations must have taken place." *Hill v. Heritage Resources*, 964 S.W.2d 89, 109 (Tex. App.—El Paso 1997, pet. denied).

[30] *Nola Spice Designs, LLC v. Haydel Enters., Inc.,* 783 F.3d 527, 536 (5th Cir. 2015); *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008).

[31] 15 U.S.C. § 1114(1)(a).

[32] See generally, e.g., *Am. Rice*, 518 F.3d at 329.

96.     First, the Dwyer Group is the owner of the Dwyer Marks, all of which are legally protectable marks.  Indeed, the Dwyer Marks have become incontestable pursuant to 15 U.S.C. § 1065.

97.     Second, Predictive's use of marks that are identical with, or substantially indistinguishable from, the Dwyer Marks on goods and services covered by registrations for the Dwyer Marks is likely to cause confusion.

98.     Predictive has used the Dwyer Marks knowing they are infringements in connection with the advertisement, promotion, sale, offering for sale and distribution of goods or services to consumers, the public, and the trade.

99.     Predictive's use of the Dwyer Marks to advertise, promote, offer for sale, distribute and sell its goods and services was and is without the consent of Dwyer Group.

100.    Predictive's unauthorized use of the Dwyer Marks on and in connection with defendants' advertisement, promotion, sale, offering for sale and distribution of watches through the World Wide Web constitute defendants' use of the Dwyer Marks in commerce.

101.    Predictive's unauthorized use of the Dwyer Marks as set forth above has been and is likely to: (1) cause confusion, mistake and deception; (2) cause consumers, the public, and the trade to believe that Predictive's goods and services are the same as the Dwyer Group's goods and services or that Predictive is authorized, sponsored or approved by the Dwyer Group or that Predictive is affiliated, connected or associated with or in some way related to the Dwyer Group; and (3) result in Predictive unfairly benefiting from the Dwyer Group's advertising and promotion and profiting from the reputation of the Dwyer Group and its Dwyer Marks all to the substantial and irreparable injury of consumers, the public, the trade, the Dwyer Group and the Dwyer Marks and the substantial goodwill represented thereby.

102.    Predictive's acts as aforesaid constitute trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. §1114.

103.    Predictive's acts are both willful and malicious.

104.    Based on the Dwyer Group's extensive advertising under the Dwyer Marks, its extensive sales and the wide popularity of its goods and services, the Dwyer Marks have acquired a secondary meaning so that any product, service, or advertisement bearing such trademarks is immediately associated by consumers, the public, and the trade as being a product or service and affiliate of the Dwyer Group.

105.    Predictive's activities constitute use in commerce of the Dwyer Marks. Predictive's use of the Dwyer Marks in connection with its sale, offers of sale, distribution, promotion and advertisement of their goods and services infringes on the Dwyer Marks.

106.    Predictive has used the Dwyer Marks, knowing they are the exclusive property of the Dwyer Group, in connection with Predictive's sale, offers for sale, distribution, promotion, and advertisement of its goods.

107.    Predictive's activities have created and do create the false and misleading impression that Predictive is sanctioned, assigned or authorized by the Dwyer Group to use the Dwyer Marks to advertise, manufacture, distribute, appraise, offer for sale or sell goods or services bearing the Dwyer Marks when it is not so authorized.

108.    Predictive has engaged and does engage in the aforementioned activity with the intent to confuse and deceive consumers, the public, and the trade into believing that it and its services and products are in some way sponsored, affiliated or associated with the Dwyer Group, when in fact they are not.

109.    Predictive's use of one or more of the Dwyer Marks has been without the consent of the Dwyer Group, is likely to cause confusion and mistake in the minds of consumers, the public, and

the trade and, in particular, tends to and does falsely create the impression that the goods and services advertised, promoted, distributed and sold by Predictive are warranted, authorized, sponsored or approved by the Dwyer Group when, in fact, they are not.

110.     Predictive's unauthorized use of the Dwyer Marks has resulted in it unfairly benefiting from the Dwyer Group's advertising and promotion, and profiting from the reputation of the Dwyer Group and the Dwyer Marks, to the substantial and irreparable injury of consumers, the public,  the trade, the Dwyer Group, and the Dwyer Marks and the substantial goodwill represented thereby.

111.     The digits to assess likelihood of confusion all weigh in favor of the Dwyer Group.

112.     Predictive's acts constitute willful trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. §1114.

113.     The actions of Predictive as set forth above were done deliberately and intentionally.

114.     Predictive's actions as alleged herein have caused and will continue to cause irreparable damage and injury to the Dwyer Group if not enjoined by this Court.

115.     The Lanham Act provides, in pertinent part, that subject to the principles of equity, a plaintiff shall be entitled:

> to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . . In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.[33]

Thus, under the Lanham Act, multiple approaches to calculating damages are available: (1) the trademark owner's damages, which can include lost profits, price erosion damages, damage to the

---

[33] 15 U.S.C. § 1117(a).

mark, and corrective advertising; (2) reasonable royalty; (3) disgorgement of the infringer's profits; and (4) statutory damages, in the case of trademark counterfeiting.[34]

<u>Corrective Advertising</u>

116.    A trademark owner has been compelled to incur advertising costs to correct confusion caused by infringement of its mark, damages have been awarded to compensate the trademark owner for this cost of corrective advertising.[35]

117.    Courts have awarded damages for prospective corrective advertising.[36]    Damages determined for prospective corrective advertising must be reasonable and justified by demonstrating that "the confusion caused by the defendant's mark injured the plaintiff and that the repair of the old trademark, rather than adoption of a new one, is the least expensive way to proceed."[37] In this case, the Dwyer Group has invested millions in advertising and promoting its brands each year. Accordingly, the cost of adopting a new trademark would likely outweigh the cost of repairing the Dwyer trademarks.

118.    "An award of corrective advertising is intended to compensate a trademark owner for the amount it has spent, or will be required to spend in the future, to dispel harmful confusion caused by a defendant's infringement."[38] Such relief is intended to make the injured plaintiff whole.[39] Courts looking at this issue have awarded the amount spent in 1 year in advertisement and others have followed the FTC's rule that corrective advertising should amount to 25% of the amount spent in the marketplace.  The FTC's rule that corrective advertising should amount to 25% of the amount spent

---

[34]  Litigation Services Handbook, The Role of the Financial Expert, Fourth Edition — Weil, Frank, Hughes, Wagner, 20.24-31
[35]  Litigation Services Handbook, The Role of the Financial Expert, Fourth Edition — Weil, Frank, Hughes, Wagner, 20.26. Restatement (Third) of Unfair Competition (1995).
[36]  *Big 0 Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365 (10th Cir. 1977).
[37]  *Zazu Designs v. L'Oreal*, 979 F.2d 499, 506 (7th Cir. 1992).
[38]  *Simon Property Group, L.P. v. mySimon, Inc.*, No. IP 99-1195-CH/G, 2001 WL 66408, at *23 (S.D. Ind. Jan. 24, 2001).
[39]  See *Big O*, 561 F.2d at 1374–75.

in the marketplace is reasonable and justified in this case.  Accordingly, the Court awards Dwyer $1,751,819 as corrective advertising damages.

119.    Dwyer Group is entitled to a reasonable royalty as part of its damages.  This Court has wide discretion in determining the appropriate remedy.[40]  "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."[41] Courts will award damages even though the plaintiff offers no evidence of actual diverted sales or customers.[42]

120.    Courts have determined reasonable royalty based in part on the amount the defendant had previously offered to pay plaintiff to license the mark.[43]  A reasonable royalty may be used in circumstances such as where lost profits are nonexistent or difficult to prove or when defendant has failed to make a profit.  Under a reasonable royalty, it is presumed that the plaintiff would have granted the defendant a license to use its mark(s).  A reasonable royalty is what would have been the negotiated as a royalty between a willing licensor and willing licensee at the time of first infringement.

121.    Courts generally look at the *Georgia-Pacific* factors when evaluating reasonable royalty, which include the following:

1.    The royalties received by the owner for the licensing of the marks in suit, proving or tending to prove an established royalty.
2.    The rates paid by the licensee for the use of other trademarks comparable to the patent in suit.
3.    The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
4.    The licensor's established policy and marketing program to maintain his trademark monopoly by not licensing others to use the invention or by

---

[40] *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1092 (7th Cir.1994).
[41] 15 U.S.C. § 1117(a).
[42] *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1126-27 (5th Cir. 1991), aff'd, 505 U.S. 763 (1992).
[43] *Boston Profession Hockey Association v. Dallas Cap & Emblem Manufacturing, Inc.,* 597 F.2d 71, 75-76 (5th Cir. 1979).

granting licenses under special conditions   designed   to   preserve   that monopoly.

5.    The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business.

6.    The effect of selling the trademark in promoting sales of other products of the licensee; that existing value of the trademark to the licensor as a generator of sales.

7.    The duration of the trademark and the term of the license.

8.    The established profitability of the product made under the trademark; its commercial success; and its current popularity.

9.    The utility and advantages of the trademarks over other non-infringing marks, if any, that had been used for working out similar results.

10.   The extent to which the infringer has made use of the mark; and any evidence probative of the value of that use.

11.   The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

12.   The portion of the realizable profit that should be credited to the TM as distinguished from non-trademark elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

13.   The opinion testimony of qualified experts.

14.   The amount that a licensor (such as the TM owner) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee-- who desired, as a business proposition, to obtain a license to offer and sell a particular good or service using the marks -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent TM owner who was willing to grant a license.

122.   A reasonable royalty in this case would be $120,000 per year.  This amount is based on the fact that under the terms of the parties' contract, PTN and/or Dwyer earned a rebate from annual subscriptions.  On average, the annual subscriptions for 2018 totaled $595,000 per year.  Given that Defendant would be competing against PTN and/or Dwyer, a reasonable royalty in this amount is appropriate.

123.   The Dwyer Group is also entitled to a permanent injunction pursuant to the Lanham Act, 15 U.S.C. § 1116 to prevent any future trademark infringement by Predictive or any related entities.

124.    The Dwyer Group has shown Predictive's past (and continuing) trademark infringement. Predictive should be enjoined from any future infringing actions. A permanent injunction restraining further use in any manner of the Dwyer Group's trademarks should and will, therefore, be issued.

125.    Based on the above, this case constitutes an exceptional case as defined by 15 U.S.C. § 1117(a). Dwyer is entitled to attorneys' fees under the Lanham Act.

Respectfully submitted,

/s/Jim Dunnam
JIM DUNNAM
State Bar No. 06258010
jimdunnam@dunnamlaw.com
ANDREA MEHTA
State Bar No. 24078992
andreamehta@dunnamlaw.co
DUNNAM & DUNNAM LLP
4125 West Waco Drive
Waco, Texas 76714-8418
Telephone (254) 753-6437
Facsimile (254) 753-7434

and

VICTOR C. JOHNSON
State Bar No. 24029640
VJohnson@dykema.com
DYKEMA GOSSETT PLLC
1717 Main Street, Suite 4200
Dallas, Texas 75201
(214) 462-6400 – Telephone
(214) 462-6401 - Facsimile

Attorneys for ProTradeNet LLC and Dwyer Franchising, LLC

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the above and foregoing has been filed by ECF and sent to counsel of record via electronic notification on October 4, 2019.

/s/Jim Dunnam
Jim Dunnam