UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| PROTRADENET, LLC | § | |
| | § | |
| *Plaintiff.* | § | |
| | § | **Consolidated** |
| v. | § | **Civil Action No. 6:18-CV-38-ADA** |
| | § | |
| PREDICTIVE PROFILES, INC. | § | |
| | § | |
| *Defendant.* | § | |

| | | |
|---|---|---|
| PREDICTIVE PROFILES, INC. | § | |
| | § | |
| *Plaintiff.* | § | |
| | § | |
| v. | § | |
| | § | |
| PROTRADENET, LLC AND DWYER | § | |
| FRANCHISING, LLC, | § | |
| | § | |
| *Defendants.* | § | |

## PROTRADENET'S AND DWYER'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiff ProTradeNet, LLC ("PTN" herein) and Counter-Plaintiff Dwyer Franchising, LLC ("Dwyer" herein), who file these Amended Proposed Findings of Fact and Conclusions of Law in accordance with Local Rule CV-16(e)(8).

## PROPOSED FINDINGS OF FACT

1.    In February 2017, PTN entered into a DISTRIBUTOR VENDOR RELATIONS AGREEMENT (the "Agreement" or "PTN Agreement") with Predictive Profiles, Inc. ("Predictive").[1] Luke Stanton, President of PTN, signed the Agreement on February 23, 2017, on

---

[1] Plaintiffs' Exhibit No. 72, ECF 23-1 at 8-13.

behalf of PTN.[2]   Carla Bainbridge, President and CEO of Predictive, signed the Agreement on February 21, 2017, on behalf of Predictive.[3] Mary Thompson, COO of Dwyer, was heavily involved in the negotiation of the PTN Agreement and the relationship between the parties thereafter. [4]

      2.      The Agreement's effective date is when it was signed by PTN[5] on February 23, 2017.[6]

      3.      Predictive is specifically listed as a "non-exclusive preferred vendor" in the PTN Agreement.[7]

      4.      PTN provides various services to various separate franchise brands, which are subsidiaries of Dwyer, and those brands are referred to as "Trading Partners" in the Agreement.[8] Those Trading Partners are listed in EXHIBIT "B" to the PTN Agreement.[9] Independently owned and operated franchisees of each Trading Partner are referenced under the Agreement as "Contractors."[10]

      5.      PTN is a Dwyer subsidiary (Dwyer changed its public name to Neighborly in 2018)[11] whose role generally is to provide a wide range of options that may benefit franchisees, ranging from cheaper sources of supplies to new technologies and services through third-party vendors.[12]   In the case of Predictive, the hoped-for benefit was access to more qualified employees and easier hiring processes.[13] PTN accomplishes its role by researching best practices and qualified vendors for products and services that may be of benefit to franchisees, then selecting "Preferred Vendors."[14] A

---

[2] Plaintiffs' Exhibit No. 72, ECF 23-1 at 8-13.
[3] Plaintiffs' Exhibit No. 72, ECF 23-1 at 8-13.
[4] Final Trial Transcript, Page 11 at Line 20 - Page 12 at Line 8 (hereinafter "Transcript").
[5] Plaintiff's Exhibit 72 at Section 8.9 (Distributor Vendor Relations Agreement).
[6] *Id.*
[7] Plaintiffs' Exhibit No. 72, ECF 23-1 at 8-13.
[8] Plaintiffs' Exhibit No. 72, ECF 23-1 at 8-13.
[9] Plaintiffs' Exhibit No. 72, ECF 23-1 at 8-13.
[10] Plaintiffs' Exhibit No. 72, ECF 23-1 at 8-13.
[11] Transcript, Page 4 at Lines 3-8.
[12] Transcript, Page 8 at Lines 1-12. See also Transcript, Page 226 at Lines 10-16.
[13] Transcript, Page 14 at Lines 12-20.
[14] Transcript, Page 227 at Line 25 – 228: Line 8.

Distributor Vendor Relations Agreement is then signed establishing the relationship between PTN and the Preferred Vendor.[15] The Preferred Vendors are made known to franchisees as determined by each individual Dwyer brand (i.e. "Trading Partner"), and if selected by that brand, the Preferred Vendor is afforded access to its franchisees through direct communications and events such as conventions and training sessions.[16]

6.      Even if a brand selects to participate in the PTN offered services, franchisees are never required to use Preferred Vendors.[17] Franchisees are simply made aware of the goods and services of the Preferred Vendors, including things like cheaper pricing and vendor rebates.[18] Preferred Vendors are generally non-exclusive, meaning PTN may have multiple Preferred Vendors for the same or similar product or service.[19] The contracts are generally terminable by either party for no cause within ninety (90) days.[20]

7.      The PTN Agreement involving Predictive in this case was terminable with or without cause by either party upon at least ninety (90) days advance written notice of the party's intent to terminate the Agreement.[21]

8.      Within each category of goods or services, the establishment of agreements with multiple Preferred Vendors (i.e. non-exclusive), and the ability to readily add and remove vendors as needed (i.e. no-cause 90-day termination rights), is seen as essential to keep the marketplace competitive and to provide franchisees with various and multiple options and alternatives for how they want to run their independently owned and operated franchise business.[22] This framework

---

[15] Transcript, Page 228 at Lines 22-25.
[16] Transcript, Page 9 at Lines 1-15. See also Transcript, Page 232 at Lines 14-20.
[17] Transcript, Page 232 at Lines 10-13.
[18] Transcript, Page 226 at Lines 22-24. See also Transcript, Page 9 at Lines 11-15.
[19] Transcript, Page 230 at Lines 14-17.
[20] Transcript, Page 10 at Lines 10-13.
[21] Plaintiff's Exhibit 72 at Section 1 (Distributor Vendor Relations Agreement).
[22] Transcript, Page 10 at Lines 5-18.

supports PTN's position in not entering into exclusive agreements.[23] The resulting competitive marketplace thus allows franchisees more options, while maintaining a certain level of accountability with vendors to ensure best possible pricing and service.[24]  All of this is well known to everyone involved, from franchisees to brands to vendors, and vendors entering the system accept this framework.[25] In the end, it is up to the Preferred Vendor to earn the business of each brand and franchisee.[26]  There are approximately 200 vendors who participate in PTN's Preferred Vendor program.[27]  During the term of the PTN Agreement there were at least 3 other Preferred Vendors who offered similar services regarding employee hiring.[28]

9.      Pursuant to the Agreement, PTN granted Predictive an opportunity to market and promote Predictive's products and services to the Trading Partners and Contractors who elected to participate. Predictive was specifically designated as a "non-exclusive preferred supplier," and PTN provided franchisees with information and recommended and encouraged franchisees to use the services of Predictive.[29] The Agreement specifically provided that there were no quotas or minimum number of sales or inquiries pertaining to the Program.[30]  There were no guarantees.[31]  Predictive (through CEO Carla Bainbridge) admitted at trial that no quotas were required or guaranteed, and that Predictive understood that PTN was not required or obligated to make franchisees sign up.[32]

---

[23] Transcript, Page 10 at Lines 14-18.
[24] Transcript, Page 229 at Lines 16-22; Page 230 at Lines 18-25.
[25] Transcript, Page 29 at Lines 3-7.
[26] *See* Transcript, Page 29 at Line 3-7. *See also* Transcript, Page 232 at Lines 21-23. (There are no guarantees)
[27] Transcript, Page 9 at Lines 1-7.
[28] Transcript, Page 120 at Lines 14-17. See also Transcript, Page 249 at Lines 6-11. See also Transcript, Page 47 at Lines 5-7.
[29] Plaintiff's Exhibit 72 at Section 2.2 (Distributor Vendor Relations Agreement).
[30] Plaintiff's Exhibit 72 at Section 2.3 (Distributor Vendor Relations Agreement).
[31] Transcript, Page 232 at Lines 21-23.
[32] Transcript, Page 391 at Lines 17-23.

10.     As part of the Agreement, PTN allowed Predictive limited rights to display the PTN and participating Trading Partner trademarks and logos.[33]  Such use was subject to written or e-mail approval from PTN or the participating brand.[34] The Agreement provides that Trading Partners may be added or removed at any time.[35] The Agreement states that Predictive will receive written or e-mail notification of a change, but does not state that that notice must be in advance of removal or addition.[36]

11.     After beginning its relationship with PTN, Predictive's system was initially not widely implemented.[37] One reason related to Indeed.com, a national job recruitment web-portal.[38] The PTN Agreement does not reference or mention Indeed.com.[39] Bainbridge stated to Dwyer COO Mary Thompson that "without a tighter integration with Indeed[.com], we may have a failed business model."[40] Predictive did not previously use Indeed when the PTN Agreement was signed, and Predictive did not have a relationship with Indeed prior to PTN.[41]  As a result, Predictive solicited PTN to provide Predictive with PTN's contacts at Indeed.[42] Learning of Predictive's lack of prior relationship with Indeed was a course of concern by PTN.[43]  Unbeknownst to PTN and Dwyer at the time, Predictive was also trying to figure out how to "leverage" the Indeed integration for other projects, hoping that Dwyer would financially pay for it and provide the setup.[44]

---

[33] Plaintiff's Exhibit 72 at Section 6 (Distributor Vendor Relations Agreement).
[34] *Id.*
[35] Plaintiff's Exhibit 72 at Section 7 (Distributor Vendor Relations Agreement).
[36] *Id.*
[37] Transcript, Page 347 at Lines 24-25.
[38] Transcript, Page 357 at Lines 18-21.
[39] Plaintiff's Exhibit 72 (Distributor Vendor Relations Agreement).
[40] Plaintiff's Exhibit 8.
[41] Transcript, Page 320 at Lines 4-9. See also Transcript, Page 38 at Lines 3-18.
[42] Transcript, Page 38 at Lines 7-8.
[43] Transcript, Page 38 at Lines 16-18.
[44] Transcript, Page 323 at Line 25 – 325 at Line 11.  See also Plaintiff's Exhibit 9.

12.     Following implementation of Predictive's system and even prior to utilization of the Indeed.com website in connection with Predictive's job postings, there was unrest among franchisees because of disruption caused by Predictive's services.[45] These issues became worse following Predictive's utilization of Indeed –a fact acknowledged by Predictive in Bainbridge's sworn declaration that "Contractors were inundated with applicants and we learned there was unrest in the various Trading Partner's systems."[46] At trial, Predictive likewise admitted that Contractors had been inundated with applications and they did not like it.[47]

13.     Throughout the term of the Agreement, PTN developed additional concerns regarding Predictive's platform, such as its inability to target a specific franchisee's local employment needs.[48]

14.     Franchisees complained to their respective brands, Dwyer, and PTN about Predictive.[49] Even after the PTN Agreement was terminated, franchisees continued to complain about Predictive's job postings and the disruptions they caused.[50]

15.     One example of the type of complaints received was that an existing franchisee's employee would see that their own job was being advertised as open – although it was not actually open – leading that employee to believe that they were about to be fired and replaced.[51]  There were also complaints because prospective employees were being told that job openings existed when they did not, which meant that whenever a job vacancy actually needed to be filled, that prospective employee might believe there was no real opening as had been their prior experience.[52]  Franchisees that had not signed up with Predictive were also getting unsolicited and unwanted employees directed

---

[45] Transcript, Page 18 at Line 3 – Page 19 at Line 6.
[46] ECF 63-1 at 5. See also Transcript, Page 500 at Lines 18-20.
[47] Transcript, Page 500 at Lines 18-20.
[48] Transcript, Page 500 at Lines 18 – 501 at Line 2; Page 34 at 6 -24; Page 57 at 19 – 58 at 12; Page 134 at 4-12.
[49] Transcript, Page 33 at Lines 11-15.
[50] Transcript, Page 90 at Lines 5-9. See also Plaintiff's Exhibit 61.
[51] Transcript, Page 34 at Line 22 – Page 35 at Line 5.
[52] Transcript, Page 90 at Line 15-21.

to them – and also receiving unwanted communications from Predictive as a result (for example, a frequent complaint was that Predictive was calling franchisees telling them to sign on so they would be charged).[53] In fact, one of the franchisees that testified at trial had not signed up for Predictive and yet had people walking in to submit applications.[54] The problems and complaints grew so numerous that individual and system-wide notices to franchisees had to be issued by Dwyer subsidiaries to assure franchisees that these problems were being worked on to find solutions.[55] In addition, to testimony from Dwyer and PTN at trial, two franchisees also testified regarding these issues and verified them.[56]

16.     In response to the ongoing problems created by PTN's services, after further review, PTN decided to issue a Request for Proposal (RFP) that would solicit additional employment vendors who could solve problems related to Predictive and provide additional options to franchisees for employment issues, including an alternative applicant tracking system ("ATS").[57]

17.     While additional options were being pursued, one of the requirements of this RFP was that the new vendor specifically would have to be able to integrate with Predictive's assessment tool.[58] The RFP makes clear, in writing, that PTN was not trying to stop working with Predictive, but rather, insisting on keeping Predictive within the Preferred Vendor network.[59]  Predictive was encouraged and able to respond and submit their own proposal for the RFP.[60]  Under the RFP, Predictive would continue to be paid whether or not they were being used by a specific franchisee, or if that franchisee were using the vendor awarded the RFP because they would be incorporating the Predictive assessment tool.[61]

---

[53] *See* Transcript, Page 215 at Lines 6-23.
[54] Transcript, Page 213 at Lines16 – Page 214 Line 16. See also Transcript, Page 214 at Lines 21-23.
[55] Transcript, Page 42 at Lines 8-11.
[56] Transcript, Pages 152-157 (Jay Van Deusen); Pages 213-216 (Stacey Casey).
[57] Transcript, Page 45 at Lines 19-22. See also Transcript, Page 42 at Lines 4-11.
[58] Transcript, Page 47 at Lines 2-12.
[59] Plaintiff's Exhibit 12 at Page 3, 7.
[60] Transcript, Page 45 at Lines 1-5.
[61] Transcript, Page 46 at Line 11 – 48 at Line 14. See also Transcript, Page 52 at Lines 11-13.

18.     Though not known to PTN and Dwyer at this time, Predictive was having business troubles throughout this time and considered its business larger than they had bargained for.[62]

19.     In April 2017, Carla Bainbridge was invited to and attended a meeting with CareerPlug, who was making a proposal in response to the RFP.[63]

20.     After the April meeting, Thompson asked Bainbridge if Predictive could make changes to its platform to satisfy these growing concerns presented by franchisees, including posting individual jobs and customizing job descriptions.[64] This request was rejected because Bainbridge informed Thompson that Predictive's systems could not be customized.[65] Given this, Dwyer and PTN decided to move forward with the RFP for a vendor who would integrate Predictive and its assessment tool. Although Predictive was still invited to submit an RFP, Predictive chose not to do so.[66] Integration of Predictive's profiling system and assessment tool remained a requirement of the RFP, and it was clear that Predictive was going to get paid even though another ATS platform was chosen because of the integration.[67]

21.     Initially, Bainbridge expressed that Predictive was fully on board with cooperation and integration with the RFP vendor, even sending Thompson e-mails regarding how to integrate Predictive with the chosen ATS.[68] Specifically, Bainbridge stated: "Who did you select for an ATS provider so I can start to think about how the integration will ideally work, to be better prepared for our call?"[69] In another e-mail on the same day, Bainbridge communicated how Predictive was looking forward to the integration with the new vendor, at the time conceding that there were issues with

---

[62] Transcript, Page 39 at Lines 15-17. See also Plaintiff's Exhibit 8.
[63] Transcript, Page 43 at Line 25 – 44 at Line 2.
[64] Transcript, Page 92 at Lines 3-4. See also Transcript, Page 43 at Lines 1-12.  See also Transcript, Page 58 at Lines 5-12.
[65] Transcript, Page 91 at Line 20 – 92 at Line 4.
[66] Transcript, Page 501 at Lines 8-24.
[67] Transcript, Page 48 at Lines 3-8.
[68] Plaintiff's Exhibit 18. See also Plaintiff's Exhibit 13.
[69] Plaintiff's Exhibit 18.

Predictive's platform: "And just to be totally transparent, whomever you have selected for an ATS provider, even if there is overlap, we will figure out the integration. We want nothing but the best in terms of figuring out this total solution with you and for your organization. Who knows, maybe that company and ours would be a better market play working together, now that we have the Indeed deal figured out. I know, that we need to be able to offer a more end to end solution which includes candidate engagement and onboarding. I just want you to know that I am wide open in terms of how to figure this out."[70]

22.     Surprisingly to PTN, after CareerPlug was selected as the RFP winner, Bainbridge stopped returning phone calls and responding to e-mails despite repeated attempts.[71] When Bainbridge finally got back in touch, she then began threatening to take all of Predictive's career portals down and saying Predictive would "walk away."[72] These e-mail exchanges culminated in Bainbridge stating that she did not want to be written unless her lawyer was copied on further correspondence.[73] In subsequent e-mails, Bainbridge admitted that her failed business was attributable to her own decisions.[74]

23.     At the 2017 Reunion event hosted by Dwyer, franchisees were introduced to CareerPlug as a vendor.[75] Franchisees were told that they could continue to use Predictive if they chose.[76]

---

[70] Plaintiff's Exhibit 22.
[71] Transcript, Page 62 at Line 19 – Page 63 Line 8.
[72] Plaintiff's Exhibit 26. See also Transcript, Page 63 at Line 1 – 64, at Line 2.
[73] Transcript, Page 505 at Line 21 – Page 506 at Line 6.
[74] Transcript, Page 71 at Line 22 – 72 at Line 13. See also Plaintiff's Exhibit 30 and 48. See also Transcript, Page 72 at Line 10 – Page 73 at Line 5.
[75] Transcript, Page 71 at Lines 13-21.
[76] Transcript, Page 70 at Line 17 – Page 71 at Line 21. See also Plaintiff's Exhibit 28.

24.     While Franchisee complaints regarding Predictive's open-source job posting continued to be ongoing, the push of Predictive as a vendor with Indeed.com created more confusion for actual job postings.[77]

25.     When Indeed told PTN that Indeed's policy mean that PTN could only elect one ATS,[78] PTN chose CareerPlug.[79] Contrary to Predictive's contentions, this choice of CareerPlug for Indeed did not remove any Trading Partner from the PTN Agreement.[80] Moreover, Predictive was not using Indeed when it signed the Vendor Relations Agreement.[81] While Glass Doctor and Mr. Electric were chosen to test CareerPlug on Indeed, they were never removed from the PTN Agreement.[82] Franchisees of Glass Doctor and Mr. Electric were still able to use Predictive during the test.[83]

26.     As matters continued to deteriorate following Bainbridge's threat to pull down Predictive's job offerings, a letter dated October 2017 from Predictive's attorney notified PTN that Predictive claimed a "partnership" existed between PTN and Predictive, and that PTN was in breach of the Agreement.[84] In a response letter dated January 4, 2018, PTN's attorney made clear that, while Predictive's actions had already terminated the Agreement, PTN was open to continuing a relationship, advising Predictive's counsel that franchisees could still use Predictive's services.[85] Predictive's attorney then appeared to state that Bainbridge had not terminated the Agreement and

---

[77] Transcript, Page 55 at Line 24 – 56 at Line 12.
[78] Transcript, Page 59 at Line 15 – 60 at Line 7.
[79] Transcript, Page 60 at Lines 8-14.
[80] Transcript, Page 61 at Lines 1-7.
[81] Transcript, Page 320 at Lines 4-9. See also Transcript, Page 38 at Lines 3-18.
[82] *Id.* See also Transcript, Page 60 at Lines 18-24.
[83] Transcript, Page 60 at Line 20 – Page 30 at Line 7.
[84] Plaintiff's Exhibit 73.
[85] Plaintiff's Exhibit 86.

again accused PTN of being in breach. PTN disputed this assertion and litigation commenced between the parties.[86]

27.     Before and during the lawsuit, Bainbridge repeatedly sent threatening e-mails to Dina Dwyer-Owens, a board member of Dwyer.[87] In response to a request that she cease contacting Ms. Dwyer directly and allowing communications to go through counsel, Bainbridge persisted, ultimately threatening to get friends in the franchise media world to write negative stories about Dwyer.[88] Bainbridge further stated that "Mary Thompson, once again, via hundreds of emails, directed their franchisee's to not use Predictive Profiles. Simply illegal. We have all of the emails that we collected of this correspondence from Mary Thompson.  Many franchise owners wanted to use our services, and where barred because of Mary Thompson edicts, and with her direct reports following her direction, via other emails."[89] No e-mails were produced in discovery or entered into evidence. Bainbridge also stated in an e-mail to Dina Dwyer-Owens: "But if we do go end up battling this in court, there will be no holds bar on going to the press in August with Franchise Times and other publications nationally.  No threats here.  Just a commitment."[90] Bainbridge ultimately followed through on her commitment.[91]

28.     The present lawsuit was filed on January 12, 2018.[92]  Predictive removed the case to Federal Court and simultaneously filed a new lawsuit against both PTN and Dwyer.[93]  The two lawsuits

---

[86] ECF 1-1.
[87] Plaintiff's Exhibits 32, 33, 34, and 62. See also Transcript, Page 53 at Lines 10-15.
[88] Plaintiff's Exhibit 33. See also Transcript, Page 311 at Lines 8-17.
[89] Plaintiff's Exhibit 33.
[90] *Id.*
[91] Transcript, Page 96 at Lines 19-25.
[92] ECF 1-1.
[93] 6:18-cv-00039; ECF 1.

are now consolidated.[94]   The Parties agreed to a Preliminary Injunction on December 4, 2018.[95] Predictive violated this Preliminary Injunction.[96]

29.    This Court dismissed Predictive's claims of tortious interference with existing contracts against Dwyer[97] and gave Predictive the opportunity to replead because Predictive had failed to allege independently tortious acts.[98] In response, Predictive amended its complaint and made the unsupported allegation that PTN told franchisees that they "can  no longer use Predictive's services whatsoever."[99] At trial, Predictive offered no evidence that anyone told any franchisee that they could not use Predictive's services – Indeed the testimony at trial confirmed that franchisees were told that they had the option to use predictive.[100]   Instead, Predictive attempted to argue at trial that PTN somehow interfered with some relationship involving Indeed that resulted in Predictive job postings being impacted for three weeks.[101]   However, Predictive admitted at trial that this was the result of inadvertence, not some intentional or tortious act.[102]

30.    Even after the Agreement was terminated, franchisees were specifically told that they had the option to continue to use Predictive.[103]

31.    Ultimately, PTN's ability to provide franchisees with options with Indeed (a top national recruiting platform) was jeopardized by Predictive's non-cooperation,[104] and disruption of PTN's relationship with Indeed continues at the present time due to ongoing actions by Predictive.[105]

---

[94] ECF 20
[95] ECF 42.
[96] ECF 97.
[97] ECF 47 at 10.
[98] ECF 47 at 11.
[99] ECF 49 at ¶ 56
[100] *See* Transcript, Page 119 at Lines 3-9. See also Transcript, Page 52 at Lines 2-5. See also Plaintiff's Exhibit 28.
[101] E.g., Transcript, Page 419 at Lines 6-24.
[102] Transcript, Page 505 at Lines 9-13.
[103] *E.g,* Transcript, Page 52 at Lines 2-5.
[104] *Id.*
[105] See ECF 70.

32.     In a sworn declaration, Bainbridge admitted that there are no contracts between Predictive and franchisees: "There is never any commitment on the part of franchisees to accept Predictive's services: they may cancel at any time, or resume service, by providing credit card information and agreeing to our Terms of Service via a web-based interface."[106]

33.     Dwyer Group is the holding company for twenty three (23) franchise brands in the home services industry.[107] As it relates to the Agreement with Predictive, eleven (11) of the franchise brands were included.[108] Each brand has its own business entity that operates as a franchisor.[109] Today, there are approximately 3,800 franchisees under the various brands.  Dwyer's brands total just over $2 billion in annual revenues.[110]

34.     Dwyer Group has offered and sold goods and services in United States commerce for many years and in some cases decades under several federally registered trademarks, including MR. ROOTER, RAINBOW INTERNATIONAL, MR. APPLIANCE, MR. ELECTRIC, AIRE SERV, FIVE STAR PAINTING, WINDOW GENIE, THE GROUNDS GUYS, AND GLASS DOCTOR.[111]

35.     For example, Dwyer has used the MR. ROOTER mark since at least as early as 1969.[112] It has used the GLASS DOCTOR mark since at least as early as 1976.[113] The Dwyer Group has used the MR. ROOTER, RAINBOW INTERNATIONAL, MR. APPLIANCE, MR. ELECTRIC, AIRE SERV, FIVE STAR PAINTING, WINDOW GENIE, THE GROUNDS GUYS, AND GLASS

---

[106] ECF 63-1 at 4 (emphasis added).
[107]  Transcript, Page 4, at Lines 3-4.
[108] Transcript, Page 82, at Lines 18-20.
[109] Transcript, Page 31 at Lines 9-13.
[110] Transcript, Page 7 at Lines 10-23.
[111]  *Id.*
[112]  *Id.*
[113]  *Id.*

DOCTOR  marks continuously in United States commerce for many years and well before the Defendant's use.[114]

36.     Dwyer Group has offered and sold goods and services under the MR. ROOTER, RAINBOW INTERNATIONAL, MR. APPLIANCE, MR. ELECTRIC, AIRE SERV, FIVE STAR PAINTING, WINDOW GENIE, THE GROUNDS GUYS, AND GLASS DOCTOR marks throughout the United States via its franchisees and through associated web sites.[115] Dwyer Group has also advertised the goods and services on radio, T.V., print magazines, trade shows and social media.[116]

37.     Dwyer Group has invested substantial time, effort and financial resources promoting its MR. ROOTER, RAINBOW INTERNATIONAL, MR. APPLIANCE, MR. ELECTRIC, AIRE SERV, FIVE STAR PAINTING, WINDOW GENIE, THE GROUNDS GUYS, AND GLASS DOCTOR  marks in connection with the marketing and sale of its goods and services.[117] As a result, these trademarks have become, through widespread and favorable public acceptance and recognition, an asset of substantial value as a symbol of Dwyer, its quality products and its goodwill.

38.     The Dwyer Marks are arbitrary and fanciful marks that are entitled to the highest level of protection afforded by law.

39.     The Dwyer Marks are associated with each of the franchised brands in the minds of consumers, the public and the trade.

40.     Dwyer Group owns and maintains websites associated with each trademark. Dwyer Group uses these websites to promote each brand.[118] Dwyer Group spends significant resources to advertise and promote itself, the brands and trademarks on the Internet via its website and search

---

[114] *Id.*; Transcript, Page 82 at Line 21 – Page 83 at Line 6.
[115] Transcript, Page 83 at Lines 2-6.
[116] Transcript, Page 83 at Lines 7-13.
[117] Transcript, Page 75 at Line 20 – Page 76 at Line 10.
[118] Transcript, Page 83 at Lines 2-6; Page 84 at Lines 12-14.

optimization. For example, in 2018 Dwyer Group spent $10.4 million.[119] This includes paid search advertising, web banner advertising, website content creation and maintenance, and other web activities.

41.      Dwyer Group promotes its service nationally and locally via a variety of mediums such as T.V., radio, and print. For any given year, Dwyer Group spends more than $7 million in national and local advertisements.[120] Dwyer Group also uses social media as a marketing channel. For example, Dwyer Group uses Facebook as a marketing channel to attract customers and others (e.g., potential franchisees and potential employees/contractors for its franchisees).[121] For the MR. ROOTER mark, Dwyer uses the page <facebook.com/MrRooterLLC>. Current and potential customers can use the page to learn of services offered under the MR. ROOTER mark, locations, and even book an appointment.

42.      Dwyer Group also has Yelp pages for its wholly owned brand franchises. Dwyer uses Yelp as a marketing channel to attract customers and others (e.g., potential franchisees and potential employees/contractors for its franchisees).[122] Current and potential customers can use the page to learn about the services offered under the MR. ROOTER mark, locations, and even book an appointment.

43.      Dwyer Group spends over $7 million a year to advertise and promote its wholly owned brand franchises on various mediums, such as T.V., print, radio, and social media.[123] These are only hard advertising expenses and do not include any soft costs such as people costs.[124] On social media, Dwyer spent $151,515 in 2018 and the same for 2019.[125] For 2018, Dwyer spent an average of $1.34

---

[119] Transcript, Page 87 at Lines 7-11.
[120] Transcript, Page 84 at Lines 7-12.
[121] Transcript, Page 140 at Line 10 – Page 141 at Line 6.
[122] *Id.*
[123] Plaintiff's Exhibit 95; Transcript, Page 83 at Line 7 – Page 84 at Line 11.
[124] Transcript, Page 86 at Lines 8 -  Page 87 at Line 1.
[125] Transcript, Page 88 at Lines 6-12.

million per month, $16.1 million annually to advertise, promote the 11 brands.[126]  Dwyer has spent more in 2019.[127]

      44.      Below are Dwyer's total advertising expenditures for the marks at issue:[128]

| | | |
|---|---|---|
| ASV | US | $798,386 |
| FSP | US | $708,030 |
| GUY | US | $328,643 |
| MDG | US | $831,760 |
| MRA | US | $727,459 |
| MRE | US | $470,395 |
| MRR | US | $2,203,105 |
| RBW | US | $821,046 |
| WDG | US | $118,455 |
| TOTAL | | $7,007,279 |

      45.      The Dwyer Marks identify high quality products originating with the Dwyer Group's franchise brands.

      46.      Based upon the Dwyer Group's extensive advertising, sales and the wide popularity of products and services, the Dwyer Marks have acquired secondary meaning so that any product or

---

[126] Transcript, Page 88 at Lines 13-18.
[127] Transcript, Page 88 at Lines 19-22.
[128] Plaintiff's Exhibit 95.  The following is the key to the acronyms used above:
      Aire Serv – ASV
      Five Star Paining – FSP
      The Grounds Guys – GUY
      Glass Doctor – MDG
      Mr. Appliance – MRA
      Mr. Electric – MRE
      Mr. Rooter – MRR
      Rainbow International – RBW
      Window Genie – WDG

services and advertisement bearing such marks is immediately associated by consumers, the public and the trade as being a product and affiliate of the Dwyer Group.[129]

47.     The Dwyer Group has gone to great lengths to protect its Dwyer Marks and enforce the Dwyer Marks.[130]

48.     The Dwyer Marks are in full force and effect and have become incontestable pursuant to 15 U.S.C. § 1065.

49.     After the Agreement was terminated, PTN sent Predictive a notice that it was no longer authorized to use the Dwyer Marks on webpages it had been operating as part of its services and it was to disable or terminate the domain names that utilized the marks as well.[131]   At the time, Predicative was using each of the eleven (11) Dwyer Marks in several URLs (e.g., http://applyataireserv.com).[132]   Furthermore, all the content on the pages had been created by Dwyer[133].

50.     Rather than ceasing to use the Dwyer Marks, taking down the URLs, and discontinuing use the domains after it no longer had contractual rights to use Dwyer's Marks, Predictive registered new URLs and then "redirected" all traffic from prior URLs to new ones. For example, if one typed the domain "applyatmrrooter.com," that person would be redirected to Predictive's new domain, "applyforplumbingjobs.com," and the content on these new domains still used the Dwyer Marks without permission.[134]   As a result, Predictive was using and profiting from the registered trademarks without license or consent. Even after being ordered to turn over the infringing URLs and to cease to use Dwyer's marks, Predictive continues to use the new domains and infringe Dwyer's trademarks.[135]

---

[129] *See* Transcript, Page 82 at Line 10 – Page 83 at Line 13.
[130] Transcript, Page 77 at Lines 7-15. See Also Plaintiff's Exhibit 75.
[131] *Id.*
[132] Plaintiff's Exhibits 87-90.
[133] Transcript, Page 68 at Lines 9-21.
[134] Plaintiff's Exhibits 87-90.
[135] Transcript, Page 89 at Line 23 – Page 90 at Line 9. See also Plaintiff's Exhibit 61.

51.     Predictive's acts after the Agreement was terminated were intentional and calculated to confuse and to deceive the consumers, the public and the trade and were performed with full knowledge of the Dwyer Group's rights.

52.     After the Agreement was terminated, Predictive was no longer associated, affiliated or connected with, or endorsed or sanctioned by The Dwyer Group.

53.     After the Agreement was terminated, the Dwyer Group has never authorized or consented in any way to the use by Predictive of the Dwyer Marks or copies thereof.

54.     The use by Predictive of the Dwyer Marks or copies thereof on Predictive's products and services is likely to cause consumers, the public and the trade to believe erroneously that the goods or services offered or sold by Predictive emanate or originate from the Dwyer Group, or that said items are authorized, sponsored, or approved by the Dwyer Group, even though they are not.[136]

55.     This confusion causes irreparable harm to the Dwyer Group and weakens the distinctive quality of the Dwyer Marks.[137]

56.     By using infringements of the Dwyer Marks on Predictive's goods and services, Predictive is trading on the goodwill and reputation of the Dwyer Group and creating the false impression that Predictive's goods and services are the Dwyer Group's legitimate products and services.

57.     Predictive has been unjustly enriched by illegally using and misappropriating the Dwyer Group's intellectual property for Predictive's own financial gain.

58.     Furthermore, Predictive has unfairly benefited and profited from the Dwyer Group's outstanding reputation for high quality products and services, and its significant advertising and promotion of the Dwyer Group products and services and the Dwyer Marks.

---

[136] *Id.*
[137] *Id.*

59.     Predictive has disparaged the Dwyer Group, its Dwyer Marks and its products and services by creating a false association with the Dwyer Group, its genuine goods and services, and the Dwyer Marks.

60.     The Dwyer Group has had no control over the nature and quality of the products and services sold by Predictive bearing infringements of the Dwyer Marks.

61.     Among other things, Predictive's distribution, sale, offers of sale, promotion and advertisement of its products and services has reflected adversely on the Dwyer Group as the believed source of origin thereof, hampered continuing efforts by the Dwyer Group to protect its outstanding reputation for high quality, originality and distinctive goods and services, and tarnished the goodwill of the Dwyer Marks to consumer, the public, and the trade, and, unless retrained, will continue to do so.[138]

62.     After the Agreement was terminated, rather than taking down the domain names and to cease using the registered trademarks, Predictive instead registered new domains and then "redirected" all traffic from the domains using the eleven (11) franchise brand's trademarks to the new domains. For example, if one typed the domain "applyatmrrooter.com," that person would be redirected to Predictive's new domain, applyforplumbingjobs.com.[139]   As a result, , Predictive was using and profiting from the registered trademarks without license or consent by using the domains. Predictive has turned over some of the domains using the eleven (11) franchise brand's trademarks to Dwyer after being ordered to do so by the Court in this case.  However, Predictive continued to use the new domains as discussed below.

63.     The webpages Predictive created, posted, and continues to operate for the new domains it registered use the registered trademarks without license or consent.[140] That is, Predictive

---

[138] Transcript, Page 89 at Line 23 – Page 90 at Line 9. See also Plaintiff's Exhibit 61.
[139] *Id.*
[140] *Id.*

operated at least eleven (11) new domains using the franchise brand's trademarks on the webpages without consent or license. These domain names do not resolve to websites owned, controlled or endorsed by Dwyer. Instead, they resolve to websites that are owned and controlled by Defendant. Below are reproductions of the webpages from these new domains:

http:www.applyforhvacjobs.com



http://applyforglassrepairjobs.com/



http://www.applyforgoundskeeperjobs.com/



http://applyforwindowcleaningjobs.com/





http://www.applyforpaintingjobs.com/



http://www.applyforelectriciancareers.com/



http://www.applyforappliancerepairjobs.com/



http://www.applyforplumbingjobs.com/



http://applyforrestorationjobs.com/



64.     Predictive has acted with reckless disregard for the Dwyer Group's rights or were willfully blind in connection with their unlawful activities.

65.     Predictive has willfully and maliciously engaged in its infringing activities.

66.     As a result of the foregoing, this case constitutes an exceptional case as defined by 15 U.S.C. § 1117(a).

67.     As a result of the foregoing, the Dwyer Group must engage in extensive corrective advertising once Predictive's infringing activities has been restrained by the permanent injunction issued below.[141]   Dwyer investigated several mediums for corrective advertising, including print and internet.   Based on the infringement, Dwyer's corrective advertising will need to done on each individual brand.[142]   Based on its investigation, Dwyer believes it will need to spend $1,768,481 in corrective advertising.[143]   Dwyer's damages expert, Dr. North, also calculated damages necessary for

---

[141] Transcript, Page 90 at Line 10 – Page 91 Line 15.
[142] *Id.*
[143] Transcript, Page 102 at Lines 1-14.

corrective advertising, which he placed at $160,771 per month since the date infringement began until the date of trial, or $2,893,878.[144]

68.     Dr. North also calculated damages for reasonable royalty, which he placed at $100,00 per year, or $150,000 through trial.  This amount is based on the fact that under the terms of the parties' contract, PTN and/or Dwyer earned a rebate from annual subscriptions.  On average, the annual subscriptions for 2018 totaled $595,000 per year.  From this, Defendant paid PTN and/or Dwyer a 20% rebate, or $118,800.[145]  Given that Defendant would be competing against PTN and/or Dwyer, a reasonable royalty in this amount is appropriate.

69.     Given Predictive's ongoing infringement and violation of the Court's preliminary injunction, it was reasonable for the Dwyer Group to refrain from any corrective advertising until Predictive's infringing activities have ceased.

70.     The Dwyer Group has suffered irreparable harm and damages as a result of the acts of Predictive.

71.     The injuries and damages sustained by the Dwyer Group have been directly and proximately caused by defendants' wrongful advertisement, promotion, distribution, sale and offers of sale of their goods and services bearing infringements of the Dwyer Marks.

72.     The Court also heard evidence regarding the damages PTN suffered as a result of Predictive's ongoing breaches of the PTN agreement.[146]

---

[144] Transcript, Page 175 at Lines 12-19.
[145] Transcript, Page 184 at 19-25; Page 185 at Lines 1 – 191 at Line 11.
[146] Transcript, Page 99 at Line 20 - Page 102 at Line 14.

## PROPOSED CONCLUSIONS OF LAW

ProTradeNet's Breach of Contract Claim

73.　　Under Texas law, the elements of breach of contract are: "(1) the existence of a contract; (2) performance or tendered performance by the plaintiff; (3) breach by the defendant; and (4) damages sustained by the plaintiff as a result of the breach."[147]

74.　　There is no dispute regarding the existence of the PTN Agreement.

75.　　PTN performed under the PTN Agreement.

76.　　The Court finds that Predictive breached the Agreement by (1) utilizing trademarks following termination of the PTN Agreement; (2) posting jobs for franchisees where no jobs existed and for franchisees with whom it did not have a written agreement.

77.　　The Court finds that PTN has suffered damages as a result of Predictive's breach.

78.　　Actual damages suffered by PTN and Dwyer as a result of Predictive's breach of the Agreement, excluding reputational harm and the need for corrective advertising, are as follows:

    a.　$10,440 in time spent working with Predictive to improve Predictive's system. Time spent by Trading Partner Vice-Presidents was 180 man-hours. This amount of time was necessary, and a reasonable rate for their time was $58 per hour.[148]

    b.　$4,950 in time spent working with Predictive to help Predictive with their product launch. Time spent by Mary Thompson was 25 hours. This amount of time was necessary, and a reasonable rate for their time was $198 per hour.[149]

    c.　$2,655 in time spent dealing with franchisee complaints caused by Predictive. Time spent was 45 man-hours. This amount of time was necessary, and a reasonable rate for their time was $59 per hour.[150]

    d.　$2,970 in time spent dealing with Predictive unauthorized use of marks, posting of jobs not open and mistrust created with franchisees. Time spent by Mary

---

[147] E.g., *MidCap Media Fin., LLC v. Pathway Data, Inc.,* No A-15-CV-60-LY, 2015 U.S. Dist. LEXIS 166596, at *6 (W.D.Tex. Dec 11, 2015).

[148] Transcript, Page 99 at Line 23 –Page 100 at Line 22.

[149] Transcript, Page 100 at Line 24 – Page 101 at Line 5.

[150] Transcript, Page 101 at Lines 8-15

Thompson was 15 hours. This amount of time was necessary, and a reasonable rate for their time was $198 per hour.[151]

79.     The Court finds that the PTN Agreement entitles PTN to attorneys' fees.[152]

Injunctive Relief

80.     The Court also finds that PTN is entitled to injunctive relief with respect to Predictive's posting jobs where none otherwise existed and utilization of trading partner's trademarks without authorization to do so. The Court finds that PTN has demonstrated actual success on the merits, no adequate remedy at law, and irreparable injury. The Court finds that the injury threatened to PTN outweighs any damage to Predictive. There is minimal harm to a defendant from having to comply with the law and the continuing harm to PTN and its trading partners if the injunction is not granted outweighs any potential harm to Predictive.[153]   Moreover, the parties agreed to the terms of the Preliminary Injunction; there has been no evidence on any damage to Predictive to comply with the same. The Court finds that the injunction will not disserve the public interest; indeed, the public interest is served by holding parties to their contractual obligations.[154] The Court finds that, following the entry of the Agreed Preliminary Injunction on the same topic, Predictive failed to comply with the same. The Court also finds that the Permanent Injunction is necessary based on Predictive's past non-compliance. Based on the above and the evidence heard by the Court, the Court finds that the Preliminary Injunction shall be made into a Permanent Injunction.

Predictive's Breach of Contract Claim

81.     The Court finds that Predictive's claims are barred by the Parol Evidence Rule.

---

[151] Transcript, Page 101 at Line 17 – Page 102 at Line 1.
[152] *Chevron Intellectual Prop., LLC v. Allen*, No. 7-08-CV-98-O, 2009 U.S. Dist. LEXIS 74751, at *8 (N.D. Tex. Aug. 24, 2009).
[153] *Allen*, 2009 U.S. Dist. LEXIS 74751, at *8.
[154] *McKissock, LLC v. Martin*, No. EP-16-CV-400-PRM, 2016 U.S. Dist. LEXIS 183369, at *36 (W.D. Tex. Nov. 10, 2016).

82.     As stated above, the PTN Agreement provides that "(1) there are no quotas, (2) the Agreement is non-exclusive by its very terms, and (3) the only obligation in the Agreement is that PTN let its franchisees know about Predictive's platform and nothing else."[155]

83.     Predictive states that there was a goal of 75% market penetration and its damages stemmed from the failure to reach that goal.[156] Predictive also states that PTN breached the Vendor Agreement by failing to perform as set forth in Paragraph 35 and by encouraging franchisees to use a direct competition for Predictive.[157] This requires variance from the Agreement, because the Agreement is non-exclusive, which necessarily means that would be other vendors. Moreover, the Agreement specifically provides that PTN's sole obligation is to let" its franchisees "know of [Predictive's platform] **and nothing else**."[158]

84.     The Court finds that Predictive's damage model is based on an alleged quota and that Predictive's claims are based on alleged prior agreements or statements that conflict with the PTN Agreement. Moreover, the Agreement itself states that "This Agreement sets forth the entire Agreement and understanding between the parties as to the subject matter hereof, and merges and supersedes all prior discussions, agreements and understandings of every and any nature between the parties."[159]

85.     The Court finds that, even if Predictive's claims were not barred by the Parol Evidence Rule, Predictive has not presented legally sufficient evidence of lost profits.

---

[155] Plaintiff's Exhibit 72.

[156] *E.g.,* ECF 49 at 20 ("Predictive had a reasonable probability of entering into new service agreements with the various Trading Partners' Contractors based on Neighborly and ProTradeNet's expressed commitment to a goal of 75% market penetration, as well as the rapid adoption of its services by hundreds of Contractors via the "applyatsites.").

[157] ECF 49 at 18. It is unclear what Predictive intends by reference to Paragraph 35. That paragraph does not refer to any alleged breach by PTN.

[158] Exhibit A1 at ¶ 2.3 (emphasis added).

[159] Exhibit A1 at ¶ 8.1.

86.     The Texas Supreme Court has held that "lost profits damages can be recovered only when both the fact and amount of damages is proved with reasonable certainty."[160]

87.     Additionally, the Fifth Circuit has held that "Parties cannot recover anticipated profits when 'there is no evidence from which they may be intelligently estimated.' Those profits must be ascertainable with a reasonable degree of certainty based on objective facts, figures, or data."[161]

88.     The Court finds that there are no objective facts, figures, or data supporting Predictive's damage model. Moreover, Predictive has not presented any authority substantiating a request for three years of profit from an agreement that is terminable on ninety days' notice.

<u>Predictive's Tortious Interference with Existing Contracts Claim</u>

89.     In order to establish tortious interference with contract Predictive must demonstrate "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with that contract, (3) which caused plaintiff's injury, and (4) resulted in actual damages or loss."[162]

90.     Predictive has failed to establish the existence of a contract subject to interference based on Predictive's admission that there are no contracts between Predictive and the franchisees. "A cause of action for tortious interference with a contract will not lie in the absence of a contract."[163]

---

[160] *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848 (Tex. 2017)(citations omitted)(" A party's bare assertion that a contract was lost does not establish lost profits with reasonable certainty. Rather, the general rule is that recovery of lost profits as damages is allowed "where it is shown that a loss of profits is the natural and probable consequence of the act or omission complained of, and their amount is shown with sufficient certainty." However, "anticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated." Indeed, "[t]he law is wisely skeptical of claims of lost profits from untested ventures or in unpredictable circumstances, which in reality are little more than wishful thinking." … When the evidence supporting a claim for lost profits damages is largely speculative or a mere hope for success, lost profits have not been established with reasonable certainty.").

[161] *Al-Saud v. Youtoo Media, L.P.*, 754 Fed. App'x 246, 255 (5th Cir. Oct. 22, 2018)(citations omitted)(quoting *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994)).

[162] *Wells v. Bank of Am., N.A.*, No. A-12-CA-409 LY, 2012 U.S. Dist. LEXIS 192601, at * 20-21 (W.D. Tex. Nov. 9, 2012).

[163] *Rimkus*, 688 F. Supp. 2d at 674. See also *S&A Marinas v. Leonard Marine Corp.*, 875 S.W.2d 766, 769 (Tex. App.—Austin 1994, writ denied)("**It is axiomatic that a cause of action for tortious**

91.     There were no written contracts between Predictive and any Contractor.[164]

92.     Predictive failed to demonstrate any contract with anyone that was the subject of interference by PTN or Dwyer.

93.     The Court further finds that Predictive cannot recover on its claim because PTN would not be a stranger to any contracts between Predictive and Dwyer franchisees if any contracts existed.

94.     Additionally, at trial, Bainbridge testified that any interference with any agreements was inadvertent, not intentional.[165]

Predictive's Tortious Interference with Prospective Contracts Claim

95.     In order to prevail on a claim for tortious interference with prospective contract/prospective business relations, Predictive must establish that "(1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result."[166]

96.     Predictive cannot prevail on its claim because Dwyer and PTN are not strangers to the alleged prospective contracts. "Texas jurisprudence has long recognized that a party to a contract has a cause of action for tortious interference against any third person **(a stranger to the contract)** who wrongly induces another contracting party to breach the contract. By definition, the person who

---

**interference with a contract will not lie in the absence of a contract. If a trial court can determine conclusively that no contract exists, summary judgment is appropriate.**")(citations omitted)(emphasis added).

[164] Transcript, Page 126 at Lines 8-16.

[165] Transcript, Page 505 at Lines 9-13.

[166] *Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

induces the breach cannot be a contracting party. Were we to recognize the tortious interference claim when this identity of interest exists, any party who breaches a contract could be said to have induced his own breach and would therefore be liable for tortious interference. Such logic would convert every breach of contract claim into a tort claim."[167]

97.     Under Texas law, a claim for tortious interference with a prospective contract requires pleading and proof that a party committed an independent tortious act.[168] While not meaning that a plaintiff must prove an independent tort, it does mean that "plaintiff must prove 'that the defendant's conduct would be actionable under a recognized tort.'"[169] The Court finds that Predictive has failed to establish that Dwyer and PTN committed any independently tortious act. "Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations…"[170]

98.     Predictive has also failed to identify the prospective contracts in question with reasonable certainty. Predictive failed to present *any* prospective contracts.

99.     Predictive has failed to establish that there was a reasonable probability that it would have entered into any contracts with franchisees.[171] Predictive has filed sworn declarations that it does not have any contracts with franchisees.

---

[167] *Holloway v. Skinner*, 898 S.W.2d 793, 794-95 (Tex. 1995)(emphasis added)(citations omitted). See also *In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 761 (Tex. 2006)("Thus, while liability for tortious interference arises from the general law, *nonliability* arises from connections with the contract.")(emphasis in original).

[168] *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001)(holding that "… to recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's conduct was independently tortious or wrongful.").

[169] *Seismic Wells, LLC v. Matthews*, No. 5:15-CV-148-C, 2015 U.S. Dist. LEXIS 179059, *18 (N.D. Tex. Sept. 11, 2015)(quoting *Wal-Mart*, 52 S.W.3d at 726)).

[170] *Wal-Mart*, 52 S.W.3d 711, 726 (Tex. 2001).

[171] To show reasonable probability, "it is not necessary to prove that the contract would have certainly been made but for the interference; it must be reasonably probable, considering all of the facts and circumstances attendant to the transaction. **More than mere negotiations must have taken place**." *Hill v. Heritage Resources*, 964 S.W.2d 89, 109 (Tex. App.—El Paso 1997, pet. denied).

100.    Additionally, at trial, Bainbridge testified that any interference with any agreements was inadvertent, not intentional.[172]

Dwyer's Lanham Act Claims

101.    To prevail on a claim of federal trademark infringement under the Lanham Act, 15 U.S.C. § 1051 et seq., a plaintiff must show (1) ownership of a legally protectable mark and (2) a likelihood of confusion created by an infringing mark.[173] Under the Lanham Act, a person "shall be liable in a civil action" by the registrant of a mark if the person, without the registrant's consent, "use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]"[174] This Circuit considers the following eight nonexhaustive "digits" to assess likelihood of confusion: (1) strength of the mark; (2) mark similarity; (3) product or service similarity; (4) outlet and purchaser identity; (5) advertising media identity; (6) defendant's intent; (7) actual confusion; and (8) care exercised by potential purchasers.[175]

102.    First, the Dwyer Group is the owner of the Dwyer Marks, all of which are legally protectable marks.  Indeed, the Dwyer Marks have become incontestable pursuant to 15 U.S.C. § 1065.

103.    Second, Predictive's use of marks that are identical with, or substantially indistinguishable from, the Dwyer Marks on goods and services covered by registrations for the Dwyer Marks, is likely to cause confusion.

---

[172] Transcript, Page 505 at Lines 9-13.
[173] *Nola Spice Designs, LLC v. Haydel Enters., Inc.,* 783 F.3d 527, 536 (5th Cir. 2015); *Am. Rice, Inc. v. Producers Rice Mill, Inc.,* 518 F.3d 321, 329 (5th Cir. 2008).
[174] 15 U.S.C. § 1114(1)(a).
[175] See generally, *e.g., Am. Rice,* 518 F.3d at 329.

104.    Predictive has used the Dwyer Marks knowing they are infringements in connection with the advertisement, promotion, sale, offering for sale and distribution of goods or services to consumers, the public, and the trade.

105.    Predictive's use of the Dwyer Marks to advertise, promote, offer for sale, distribute and sell its goods and services was and is without the consent of Dwyer Group.

106.    Predictive's unauthorized use of the Dwyer Marks on and in connection with defendants' advertisement, promotion, sale, offering for sale and distribution of watches through the World Wide Web constitute defendants' use of the Dwyer Marks in commerce.

107.    Predictive unauthorized use of the Dwyer Marks as set forth above has been and is likely to: (a) cause confusion, mistake and deception; (b) cause consumers, the public, and the trade to believe that Predictive's goods and services are the same as the Dwyer Group's goods and services or that Predictive is authorized, sponsored or approved by the Dwyer Group or that Predictive is affiliated, connected or associated with or in some way related to the Dwyer Group; and (c) result in Predictive unfairly benefiting from the Dwyer Group's advertising and promotion and profiting from the reputation of the Dwyer Group and its Dwyer Marks all to the substantial and irreparable injury of consumer, the public, the trade, the Dwyer Group and the Dwyer Marks and the substantial goodwill represented thereby.

108.    Predictive's acts as aforesaid constitute trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. §1114.

109.    Predictive's acts are both willful and malicious.

110.    Based on the Dwyer Group's extensive advertising under the Dwyer Marks, its extensive sales and the wide popularity of its goods and services, the Dwyer Marks have acquired a secondary meaning so that any product, service, or advertisement bearing such trademarks is

immediately associated by consumers, the public, and the trade as being a product or service and affiliate of the Dwyer Group.

111.    Predictive's activities constitute use in commerce of the Dwyer Marks. Predictive's use of the Dwyer Marks in connection with its sale, offers of sale, distribution, promotion and advertisement of their goods and services infringements of the Dwyer Marks.

112.    Predictive has used the Dwyer Marks, knowing they are the exclusive property of The Dwyer Group, in connection with defendants' sale, offers for sale, distribution, promotion and advertisement of their goods.

113.    Predictive's activities have created and do create the false and misleading impression that Predictive is sanctioned, assigned or authorized by The Dwyer Group to use the Dwyer Marks to advertise, manufacture, distribute, appraise, offer for sale or sell goods or services bearing the Dwyer Marks when it is are not so authorized.

114.    Predictive has engaged and do engage in the aforementioned activity with the intent to confuse and deceive consumer, the public, and the trade into believing that it and its services and products are in some way sponsored, affiliated or associated with The Dwyer Group, when in fact they are not.

115.    Predictive's use of one or more of the Dwyer Marks has been without the consent of the Dwyer Group, is likely to cause confusion and mistake in the minds of consumer, the public, and the trade and, in particular, tends to and does falsely create the impression that the goods and services advertised, promoted, distributed and sold by Predictive are warranted, authorized, sponsored or approved by the Dwyer Group when, in fact, it is not.

116.    Predictive's unauthorized use of the Dwyer Marks has resulted in it unfairly benefiting from the Dwyer Group's advertising and promotion, and profiting from the reputation of the Dwyer

Group and the Dwyer Marks, to the substantial and irreparable injury of consumers, the public, the trade, the Dwyer Group, and the Dwyer Marks and the substantial goodwill represented thereby.

117.    Based on the foregoing, the Court finds that the digits to assess likelihood of confusion all weigh in favor of the Dwyer Group.

118.    Predictive's acts constitute willful trademark infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. §1114.

119.    Predictive's actions as set forth above have caused and will continue to cause irreparable damage and injury to the Dwyer Group.

120.    The actions of Predictive as set forth above were done deliberately and intentionally.

121.    Predictive's actions as alleged herein have caused and will continue to cause irreparable damage and injury to the Dwyer Group if not enjoined by this Court.

122.    The Lanham Act provides, in pertinent part, that subject to the principles of equity, a plaintiff shall be entitled:

> to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . . In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.[176]

Thus, under the Lanham Act, multiple approaches to calculating damages are available: (1) the trademark owner's damages, which can include lost profits, price erosion damages, damage to the

---

[176] 15 U.S.C. § 1117(a).

mark, and corrective advertising; (2) reasonably royalty; (3) disgorgement of the infringer's profits; and (4) statutory damages, in the case of trademark counterfeiting.[177]

Corrective Advertising

123.    A trademark owner has been compelled to incur advertising costs to correct confusion caused by infringement of its mark, damages have been awarded to compensate the trademark owner for this cost of corrective advertising.[178]

124.    Courts have awarded damages for prospective corrective advertising.[179] Damages determined for prospective corrective advertising must be reasonable and justified by demonstrating that "the confusion caused by the defendant's mark injured the plaintiff and that the repair of the old trademark, rather than adoption of a new one, is the least expensive way to proceed."[180] In this case, Dwyer has invested millions in advertising and promoting its brands each year.  Accordingly, the cost of adopting a new trademark would likely outweigh the cost of repairing the Dwyer trademarks.

125.    "An award of corrective advertising is intended to compensate a trademark owner for the amount it has spent, or will be required to spend in the future, to dispel harmful confusion caused by a defendant's infringement."[181] Such relief is intended to make the injured plaintiff whole.[182] Courts looking at this issue have awarded the amount spent in 1 year in advertisement and others have followed the FTC's rule that corrective advertising should amount to 25% of the amount spent in the marketplace.  The Court find FTC's rule that corrective advertising should amount to 25% of the

---

[177]  Litigation Services Handbook, The Role of the Financial Expert, Fourth Edition — Weil, Frank, Hughes, Wagner, 20.24-31
[178]  Litigation Services Handbook, The Role of the Financial Expert, Fourth Edition — Weil, Frank, Hughes, Wagner, 20.26. Restatement (Third) of Unfair Competition (1995).
[179]  *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365 (10th Cir. 1977).
[180]  *Zazu Designs v. L'Oreal*, 979 F.2d 499, 506 (7th Cir. 1992).
[181]  *Simon Property Group, L.P. v. mySimon, Inc.*, No. IP 99-1195-CH/G, 2001 WL 66408, at *23 (S.D. Ind. Jan. 24, 2001).
[182]  See *Big O*, 561 F.2d at 1374–75.

amount spent in the marketplace reasonable and justified in this case.  Accordingly, the Court awards Dwyer $2,893,878 as corrective advertising damages.

126.     The Court also finds that Dwyer Group is entitled to a reasonable royalty as part of its damages.  This Court has wide discretion in determining the appropriate remedy.[183]  "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."[184]  Courts will award damages even though the plaintiff offers no evidence of actual diverted sales or customers.[185]

127.     Court have determined reasonably royalty based in part on the amount the defendant had previously offered to pay plaintiff to license the mark.[186]  A reasonably royalty may be used in circumstances such as where lost profits as nonexistent or difficult to prove or when defendant has failed to make a profit.  Under a reasonable royalty, it is presumed the plaintiff would have granted the defendant a license to use it mark(s).  A reasonable royalty is what would have been the negotiated royalty between a willing licensor and willing licensee at the time of first infringement.

128.     Courts generally look at the *Georgia-Pacific* factors when evaluating reasonable royalty, which include:

1.     The royalties received by the owner for the licensing of the marks in suit, proving or tending to prove an established royalty.
2.     The rates paid by the licensee for the use of other trademarks comparable to the patent in suit.
3.     The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

---

[183] *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1092 (7th Cir.1994).
[184] 15 U.S.C. § 1117(a)
[185] *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1126-27 (5th Cir. 1991), aff'd, 505 U.S. 763 (1992).
[186]  *Boston Profession Hockey Association v. Dallas Cap & Emblem Manufacturing, Inc.*, 597 F.2d 71, 75-76 (5th Cir. 1979).

4.    The licensor's established policy and marketing program to maintain his trademark monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5.    The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business.

6.    The effect of selling the trademark in promoting sales of other products of the licensee; that existing value of the trademark to the licensor as a generator of sales.

7.    The duration of the trademark and the term of the license.

8.    The established profitability of the product made under the trademark; its commercial success; and its current popularity.

9.    The utility and advantages of the trademarks over other non-infringing marks, if any, that had been used for working out similar results.

10.   The extent to which the infringer has made use of the mark; and any evidence probative of the value of that use.

11.   The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

12.   The portion of the realizable profit that should be credited to the TM as distinguished from non-trademark elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

13.   The opinion testimony of qualified experts.

14.   The amount that a licensor (such as the TM owner) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee-- who desired, as a business proposition, to obtain a license to offer and sell a particular good or served using the marks -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent TM owner who was willing to grant a license.

129.   The Court finds that a reasonable royalty in this case would be $100,000 per year. Since the date infringement began, this totals $150,000.

130.   The Dwyer Group is also entitled to a permanent injunction pursuant to the Lanham Act, 15 U.S.C. § 1116 to prevent any future trademark infringement by Predictive or any related entities.

131.   The Dwyer Group has shown Predictive's past (and continuing) trademark infringement. Predictive should be enjoined from any future infringing actions. A permanent injunction restraining further use in any manner of the Dwyer Group's trademarks should and will, therefore, be issued.

132.    The Court finds this an exceptional case and awards the Dwyer Group its attorney's fees.

Unfair Competition Claim

133.    In connection with Predictive's advertisement, promotion, distribution, sales and offers of sales of its goods and services, it has have used in commerce, and continue to use in commerce, the Dwyer Marks Trademarks.

134.    In connection with Predictive's advertisement, promotion, distribution, sales and offers of sales of its goods and services, Predictive has affixed, applied and used false designations of origin and false and misleading descriptions and representations, including the Dwyer Marks, which tend falsely to describe the origin, sponsorship, association or approval by the Dwyer Group of the goods and services sell.

135.    Predictive has used one or more of the Dwyer Marks with full knowledge of the falsity of such designations of origin, descriptions and representations, all to the detriment of the Dwyer Group.

136.    Predictive's use of the Dwyer Marks on the websites identified above and on Predictive's goods and services constitutes false descriptions and representations tending falsely to describe or represent defendant and its products and services as being authorized, sponsored, affiliated or associated with Dwyer.

137.    Predictive has used one or more of the Dwyer Marks on the websites identified above and the goods and services with the express intent to cause confusion and mistake, to deceive and mislead consumers, the public, to trade upon the reputation of the Dwyer Group and improperly to appropriate to themselves the valuable trademark rights of the Dwyer Group.

138.    Predictive's acts constitute the use in commerce of false designations of origin and false or misleading descriptions or representations, tending to falsely or misleadingly describe or

represent defendants' products as those of the Dwyer Group in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

139.    The Court finds the damages awarded to the Dwyer Group as outlined above for trademark infringement are the appropriate damages to be awarded for Predictive's unfair competition claim as well and, therefore, awards the Dwyer Group (1) $1,751,819 as corrective advertising damages, and (2) $120,000 reasonable royalty.

140.    The Dwyer Group is also entitled to a permanent injunction pursuant to the Lanham Act, 15 U.S.C. § 1116 to prevent any future unfair competition by Predictive or any related entities.

141.    The Dwyer Group has shown Predictive's past (and continuing) unfair competition. Predictive should be enjoined from any future unfair competition. A permanent injunction restraining further use in any manner of the Dwyer Group's trademarks should and will, therefore, be issued.

142.    The Court finds this an exceptional case and awards the Dwyer Group its attorney's fees.

Cybersquatting Claim

143.    Section 1125(d)(1)(A) of the Lanham Act (referred to as the Anti-Cybersquatting Consumer Protection Act or "ACPA") provides:  "A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and (ii) registers, traffics in, or uses a domain name that—(I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark.  Thus, to prevail on the merits of an ACPA claim, the Dwyer Group must show that (1) its mark "is a distinctive or famous mark entitled to protection"; (2) Predictive's "domain names are 'identical or confusingly similar to' [the Dwyer Marks]; and (3) Predictive registered, trafficked, or used the domain names with the bad faith intent to profit from them." 15 U.S.C. § 1125(d)(1)(A)).

144.   The Lanham Act provides for a number of potential remedies to a successful ACPA plaintiff, including injunctive relief, forfeiture or cancellation of the disputed domain name or transfer of the name to the plaintiff, the plaintiff's actual damages, the defendant's profits, costs, statutory damages of $1,000 to $100,000 per domain name in lieu of actual damages, and attorney's fees in "exceptional cases." 15 U.S.C. §1116(a); 15 U.S.C. §1117(a), (d); 15 U.S.C. §1125(d)(1)(C).   Courts have the discretion, "according to the circumstances of the case," to increase an award of "actual damages" to a sum not exceeding three times the amount of actual damages found.   15 U.S.C. §1117(a).

145.   As discussed above, the Dwyer Marks are distinctive and were distinctive before Defendant registered and continued to use the infringing domain names after the Agreement was terminated.

146.   The infringing domain names are either identical or confusingly similar to Dwyer's Marks.

147.   Predictive continued its registration and use of the infringing domain names after its rights had been terminated and to divert potential applicants from Dwyer's career web site to web sites accessible under the infringing domain names for Defendant's commercial gain by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the web site.

148.   Predictive's continued registration and use of the infringing domain names was intended primarily to capitalize on the good will associated with Dwyer's Marks.  This is perhaps most evidence by Predictive's registration of the new domains, redirecting of traffic from the infringing domain names, and then use if infringing content on the webpages to deceive and cause confusion to consumers, the public and the trade.

149.   Predictive continued its registration, trafficked in or used the infringing domain names with a bad faith intent to profit from Dwyer's marks and its associated goodwill.

150.    Predictive's diversion of traffic from Dwyer's authorized web sites has harmed and continues to harm Dwyer's ability to generate leads and keep its franchises supplied with proper employees and/or contractors.

151.    Predictive's continued registration and use of the infringing domain names causes Dwyer's franchises, leads, and potential leads to believe that this is Dwyer's web site or that Dwyer is allowing this advertisement.

152.    Predictive's continued registration and use of the infringing domain names has caused Dwyer damages.  The Dwyer Group has elected statutory damages in lieu of actual damages.  After consideration, the Court awards the Dwyer Group $50,000 per domain, or $550,000 total, as statutory damages.

153.    The Court also finds that the Dwyer Group is entitled to transfer of the infringing domains from Predictive.

154.    The Dwyer Group is also entitled to a permanent injunction pursuant to the Lanham Act, 15 U.S.C. § 1116 to prevent any future ACPA violation by Predictive or any related entities.

155.    The Dwyer Group has shown Predictive's past (and continuing) ACPA violations. Predictive should be enjoined from any future ACPA violations. A permanent injunction restraining further use in any manner of the Dwyer Group's trademarks should and will, therefore, be issued.

156.    The Court finds this an exceptional case and awards the Dwyer Group its attorney's fees.

Respectfully submitted,

/s/Jim Dunnam
JIM DUNNAM
State Bar No. 06258010
ANDREA MEHTA
State Bar No. 24078992
andreamehta@dunnamlaw.co
DUNNAM & DUNNAM LLP
4125 West Waco Drive

Waco, Texas 76714-8418
Telephone (254) 753-6437
Facsimile (254) 753-7434
jimdunnam@dunnamlaw.com

and

Victor C. Johnson
State Bar No. 24029640
VJohnson@dykema.com
DYKEMA GOSSETT PLLC
1717 Main Street, Suite 4200
Dallas, Texas 75201
(214) 462-6400 – Telephone
(214) 462-6401 - Facsimile

Attorneys for ProTradeNet LLC and Dwyer
Franchising, LLC

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing has been filed by
ECF and sent to counsel of record via electronic notification on December 9, 2019.

/s/Jim Dunnam
Jim Dunnam