# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| **PROTRADENET, LLC** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **CONSOLIDATED** |
| **vs** | § | **CASE NO.: 6:18-cv-38** |
| | § | |
| **PREDICTIVE PROFILES, INC.,** | § | |
| | § | |
| *Defendant.* | § | |
| | § | |
| | § | |
| | § | |
| **PREDICTIVE PROFILES, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| **PROTRADENET, LLC and** | § | |
| **DWYER FRANCHISING GROUP,** | § | |
| **LLC,** | § | |
| | § | |
| *Defendants.* | § | |

---

## DEFENDANT/COUNTERPLAINTIFF PREDICTIVE PROFILES, INC.'S POST-TRIAL PROPOSED FINDINGS OF FACT AND LAW

---

### TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW, Defendant/Counter-Plaintiff, Predictive Profiles, Inc. ("Predictive") respectfully submit its Proposed Findings of Fact and Conclusions of Law respect to the trial conducted before the Court in this matter on October 20, 2019 and October 21, 2019 as follows:

# I. PROPOSED FINDINGS OF FACT

## A. The Formation of the Parties' Business Relationship

1.     On March 7, 2016, Predictive was contacted by Grayson Brown, Dwyer's then-General Counsel, because Dwyer was interested in developing an online hiring platform for its numerous franchisors (the "Trading Partners") but did not want to run afoul of proposed NLRB rulemaking that could impact joint employer liability issues in the franchising industry. *See* T 351:9-18; D1; Amended Counterclaim; ¶ 15.

2.     On March 11, 2016, Carla Bainbridge, CEO of Predictive ("Bainbridge") conducted a webinar with Mary Kennedy Thompson, COO of Dwyer ("Thompson") during which time Bainbridge educated Thompson on Predictive's business model, including Predictive's practice of developing applicant-facing websites (the "applyatsites") with corresponding support pages and its "open recruiting" policy. After the call, Bainbridge sends Thompson an email which includes a brochure and articulated in writing, for the first of many times, that in our business model, "[a]ll locations would be listed on the site, all of the time, regardless of if a location is signed up or not. So we are continually collecting reports/applications." *See* T 354:12-19, 354:25-355:7, 356:19-357:4; D2, D3.

3.     The brochure explains that Predictive does not charge job applicants to input applications through its system, and never has; franchisees pay a flat fee on a per month basis for unlimited access to the site and may cancel at any time without penalty, or resume services at a later time as needed.  *See* T 357:24-358:15; D3.

4.     Mary Thompson testified at trial that Dwyer always understood how the open recruiting model would work and that using such a model would help the franchisees get applicants in the door to serve that need. *See* T 36:19-37:1.

5.     By April 29, 2016, Thompson emailed Bainbridge to give Predictive the green light to get to work, saying "I believe your company is exactly what we need" to meet Dwyer's goal of establishing a unified hiring platform and assessment tool for their ~2600 Contractors across several Trading Partners under the Dwyer umbrella. *See* T 359:11-360:1; D2.

### B.     Predictive Builds Job Portals for Dwyer's Brands

6.     Predictive began by collecting requirements, data from the franchisors, logos and obtained information from the brands relating to industry specific customizations. *See* T 360:3-10.

7.     Dwyer wanted to "beta test[1]" Predictive's service using Mr. Electric, which Predictive facilitated. *See* T 360:11-361:1.

8.     On June 28, 2016 Predictive conference call with Thompson and the beta test team, comprised of several Mr. Electric franchisees. Afterwards, Predictive sent email confirmations to the team members which reminded them of an upcoming webinar the following month and explained Predictive would follow up individually with each franchisee in order to set up their access to Predictive's portal. *See* T 363:1-7,  D4.

9.     At that time, Thompson claimed Predictive's job portal would be "the bedrock" and "keystone" in something Dwyer was calling its recruiting initiative, the "***RARE*** toolbox." *See* D4.

10.     Development continued: on July 12, 2016, Dwyer emailed its Trading Partners' Vice Presidents of Operations ("VPs of Ops") were asked to provide lists of their Contractors to Predictive to ensure each Contractor was assigned a log-in credential and had their franchised business in Predictive's database, which they provided. *See* T 365:19-366:6, 368:4-369:12; D5, D6.

---

[1] In his testimony, Craig Gjeltsen referred to this as an "alpha test." *See* T 271:16-272:6

11.     The VPs were asked to provide specifications for their respective brands' websites, such as logos and other branding information, knockout questions, industry-specific questions/requirements, and the like.  *See* T 366:13-367:4; D5.

12.     In the July 12, 2016 email, Mary Thompson specifically referred to Predictive as "setting up our recruiting sites by brand."  As Predictive understood it, Predictive was the sole provider of online hiring and applicant tracking services for those brands and there was limited time to get everything built before Reunion, Dwyer's once-yearly convention for all franchisees across all brands.  *See* T 367:12:24; D5.

13.     The beta test with Mr. Electric lasted about a month, after which Dwyer greenlit Predictive to build out websites for several other brands: Aire Serv, Mr. Appliance, Mr. Rooter, Grounds Guys, Window Genie, Five Star Painting, Rainbow International, and Glass Doctor.  *See* T 364:2-13.

14.     As part of the buildout process utilized input from Dwyer and its Trading Partners in building out the websites; as but one example, Predictive adopted language suggested by Dwyer's legal department in order to ensure job applicants would not be confused as to where their applications were sent. *See* T 370:6-13, 21-371:1;  D7.

15.     Predictive understood Dwyer and the brands wanted to avoid the potential for joint liability and wanted to distance themselves from the hiring process: they elected instead to use a third party, like Predictive.  Predictive directed the disclaimer be placed on all webpages for Dwyer group franchisees. *See* 371:4-16; D7[2].

---

[2] These disclaimers remained on the websites Predictive created for Dwyer's brands and were included on the generic websites created in April 2018 as well, in order to ensure no user would be confused as to whether Dwyer or its franchisor brands were affiliated with the websites in question.  *See* D 76 pp. 1, 6, 11, 16, 21, 26, 31, 36, 41.

PREDICTIVE'S POST TRIAL
                              PROPOSED FINDINGS
                              OF FACT AND LAW

16.     Ahead of Reunion 2016, Predictive provided regular progress reports to Dwyer, ensuring delivery would be on schedule. Predictive provided Thompson with a series of registration links for scheduled training webinars for Aire Serv, Five Star Painting, Glass Doctor, The Grounds Guys, Mr. Appliance, Mr. Electric, Mr. Rooter, ProTect Painters, and Rainbow International Restoration. *See* T 372:4-17.

17.     It was critical that Predictive deliver the sites ready for Reunion, because Dwyer planned to introduce them, with the *RARE* toolbox, in a major presentation to all franchisees. *See* T 372:25-373:11.

18.     The branded websites were live and ready for use on September 12, 2016. *See* T 377:54-24.

C.      **Predictive's Websites Go Live at Reunion 2016**

19.     Predictive attended Reunion 2016, where Mary Thompson presented Predictive to the crowd as part of the *RARE* toolbox. Carla Bainbridge testified the announcement was a big deal because "they had no hiring platform prior and this was already set up and ready to go." *See* T 373:18-374:6.

20.     At reunion, Predictive handed out flyers to interested franchisees that included a brochure explaining its services, as well as a scheduled set of upcoming webinars where franchises would be instructed on how to use the service. *See* T 376:11-20; D11.

21.     The webinars were a "high level overview of how [Predictive's online portal] works, why the open recruiting model was ideal, [and] how [using Predictive's portal with the open recruiting model] is going to affect [the franchisees.]" The franchisees were walked through the application process and shown how, using pre-assigned account information and passwords, they could review applicant assessments in their online dashboards. Franchisee questions were

PREDICTIVE'S POST TRIAL
                                                        PROPOSED FINDINGS
                                                        OF FACT AND LAW

answered during the webinars, as well. *See* T 379:16-380:7.

22.     In total, Predictive provided 30 training webinars for Dwyer and the brands, at its own cost. *See* T 379:5-15.

23.     After all the webinars were complete, Predictive uploaded them to the support sites created for each brand and notified Mary Thompson of their availability. Thompson, in turn, passed along the good news to her VPs for dissemination to the franchisees in their respective brands. *See* T 380:15-24, 381:24-382:9.

**D.     The Vendor Agreement**

24.     Predictive executed the Distributor Vendor Relations Agreement ("Vendor Agreement") with ProTradeNet on February 21, 2017.   *See* P72.

25.     For the 18 years of operation prior to that point, Predictive operated without a contract, which was their standard business practice, because it avoided the joint employer issues franchisors were concerned with and because of the "strong promises we had from Dwyer" which, to Predictive, made it worth any risk.  *See* T:385:25-386:5.

26.     Predictive did not understand why the contract was necessary: no money exchanged hands and Predictive was already performing.  However, at ProTradeNet's insistence, Predictive signed off on the Vendor Agreement.  *See* T 386:10-18

27.     Per the terms of the Vendor Agreement, ProTradeNet was obligated to, inter alia: (1) provide information to the Contractors about Predictive's services; (2) encourage the Contractors to use Predictive's services; and (3) recommend the Contractors adopt those services. Predictive understood this to mean ProTradeNet's obligation to recommend and encourage franchisees to use its services extended throughout the effective term of the Vendor Agreement. *See* T 389:25-391:9; P72, § 2.1.

PREDICTIVE'S POST TRIAL
                                                            PROPOSED FINDINGS
                                                          OF FACT AND LAW

28.     In addition, ProTradeNet was obligated to provide Predictive with written notice if any Trading Partners would be leaving its service during the contract term.  *See* §§ 7, 8.2

29.     Per the terms of the Vendor Agreement, either party could terminate the Vendor Agreement with, or without, cause with 90 days' notice of termination.  *See* T 231:16-24, 389:14-24; P72, P72, § 1.

30.     Per the terms of the Vendor Agreement, "all notices must be sent by overnight courier or certified mail return receipt requested."  *See* T 393:5-20; P72 §8.2.

31.     Per the Vendor Agreement, ProTradeNet was prohibited from withdrawing Trading Partners (and their Contractors) from Predictive's service without written notice.  *See* P72, §7.

32.     Per the Vendor Agreement, Predictive was obligated to provide its services to the Contractors at a reasonable price. *See* P72, § 3.2.

33.     Per the Vendor Agreement, Predictive was not required to pay any rebates to ProTradeNet. *See* T 388:25-389:12; P72, Exhibit A.

**E.      Predictive Builds New XML Feed to Integrate with Indeed.com**

34.     Throughout the Spring and Summer of 2017, Predictive worked with Indeed.com to create and implement an organic XML feed from its job board to post to Indeed.com.  *See* T 395:3-398:1.

35.     To get the XML feed operating according to Dwyer's wishes, and have all positions posted at all times, Predictive needed to become authorized as the official posting agent for the Dwyer brands.  To move that needle forward, Predictive reached out to Mary Thompson, who agreed to facilitate that authorization directly with Indeed.  Subsequently, Dwyer, Predictive, and Indeed convened a conference call where the matter was resolved in Predictive's favor.  *See* T: 398:2-399:18, 401:10-21.

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW

36.     Indeed.com was given instruction and assurances from Predictive and Dwyer that Predictive had exclusive authorization to post promoted jobs, for all franchisees across all Dwyer brands Predictive serviced.  T 399:2-8, 404:5-25; *see, also* D17, D18[3].

37.     In June 2017, emails confirm Mary Thompson's authorization to use Predictive across all the brands as the exclusive agent.  The authorization was required by Indeed.com.  *See* T 402:11-16, 402:24-404:20, 405:1-4.

38.     Based on Thompson's authorizations to Indeed.com, Predictive understood that Dwyer wanted them to be the exclusive posting agent for the brands they serviced, and to post jobs for those brands using the open recruiting model.  *See* T 405:10-19.

39.     Ms. Bainbridge testified she, Thompson, and Indeed confirmed Predictive's authorization, as Indeed required.  T 401:15-21.

40.     Once up and running, Indeed.com pulled jobs from Predictive's internal job board four times each day.  *See* T 406:1-5.

41.     On June 19, 2017, Mary Thompson emailed her VPs and encouraged them to let the franchisees know the good news.  Thompson noted "initial candidate flow has increased more than ten-fold just this morning as it went live."  Thompson's email included a cut-and-pasted message from Predictive to Dwyer, as well, which explained the new Indeed integration in more detail. *See* T 406:12-17, 406:25-408:5; D19.

42.     The email Thompson copied from Predictive, and forwarded to the VPs, also made clear that if a franchisee did not want jobs posed on Indeed for their location, they could turn

---

[3] This May 2017 email exchange highlights Indeed's confusion as to Predictive's role and authority with respect to promoted posts for Dwyer's brands. In order to avoid duplicative posting, a violation of Indeed's guidelines, Carla Bainbridge requested Mary Thompson get on a call with Indeed to address the situation.

PREDICTIVE'S POST TRIAL
                                    PROPOSED FINDINGS
                                    OF FACT AND LAW

notifications off, or ask the site be de-listed, and Predictive would take care of it.  *See* T 408:17-409:2; D19.[4]

43.     Predictive was excited by this full-throated endorsement of their efforts, and believed it "solved the VPs' problems because [getting quality candidate to apply for jobs] was the biggest thing…"  *See* T 408:13-16.

44.     That same day, in a follow up email, Carla Bainbridge requested the VPs pass along Thompson's email (D19): some franchisees had called in confused, because they had not expected to see the jump in applicants: Bainbridge noted that Grounds Guys alone had 530 applicants that morning, system-wide.  Bainbridge advised the Indeed integration cost nothing to the franchisees.  *See* T 410:1-14, 411:22-412:3; D20.

45.     Carla Bainbridge explained that Indeed took the XML feed at no charge, but the additional development time to build out, test, and implement the integration was expenses not originally contemplated when Predictive originally built the support sites.  Prior to July 2017, Predictive had not utilized any XML feeds to job posting websites on a system-wide basis, as it built out for Dwyer.  *See* T 413: 11-14.

46.     Predictive understood franchisees might be concerned because the Indeed integration was not communicated in advance: from a franchisee perspective, it was live one day and applicants started rolling in.  Carla Bainbridge testified that messaging was really Dwyer's responsibility, but Predictive attempted to get in front of the problem to protect and inform its clients by asking the VPs to ensure the messaging went out.  *See* T 412:9-14.

47.     Three days later, Marla Mock, former VP of Operations for Rainbow International,

---

[4] Carla Bainbridge testified there were several occasions where a franchisee, or a Dwyer team member on behalf of a franchisee, reached out and made just such a request.  In all cases, those requests were honored.  *See* T 409:3-17.

PREDICTIVE'S POST TRIAL
                                                        PROPOSED FINDINGS
                                                        OF FACT AND LAW

emailed Mary Thompson because franchisees were upset with the Indeed job postings. Mary Thompson suggested that the open recruiting initiative was addressing a franchisee need, and Dwyer had "erred on the side of more walking in the door than less." Thompson suggested she advise her franchisees of the need to alleviate labor issues they face, or they could opt out by messaging Predictive. *See* D21.

48.     This franchisee confusion was precisely what Predictive tried to work around, but the messaging did not get through to franchisees. Dwyer knew the franchisees could be confused. *See* 414:6-416:23; D21.

49.     Pointedly, and to the extent franchisees were possibly confused by the Indeed integration, that confusion was not related who was posting jobs, but the sudden influx of applicants. *See* T 412:19-23.

50.     Thereafter, Carla Bainbridge testified the service worked properly and franchisee adoption went up, until it all came crashing down in mid-August 2017.

### F.     ProTradeNet Breaches the Vendor Agreement

51.     The evidence admitted at trial established that, on several occasions, ProTradeNet failed to perform as required. Namely, ProTradeNet failed to promote Predictive's services (and actively promoted a competitor) during the contract term, removed Trading Partners without notice, and did not send a 90 day notice of termination until well after its business relationship with Predictive was irreparable damaged due to the foregoing, material breaches.

52.     On two, separate occasions where Predictive's Indeed feed was damaged and/or suppressed by Dwyer and ProTradeNet, which materially damaged its ability to service Contractors.

53.     In the first instance, in on August 19, 2017, Predictive's Indeed feed was interrupted

because a competitor, CareerPlug, began posting jobs via Indeed for Mr. Electric and Glass Doctor. In early August 2017, several months prior to ProTradeNet's January 12, 2018 notice of termination to Predictive (P74), Mr. Electric and Glass Doctor were surreptitiously removed from Predictive's service and transferred to CareerPlug without notice. Mary Thompson testified she directed the move and, importantly, had CareerPlug test with those brands on Indeed.com. *See* T 60:12-61:7; D22 ("Career Plug comes first[5]").

54.     Luke Stanton, President of ProTradeNet, admitted he did not know whether his company actually sent Predictive written notice of the changeover to CareerPlug, despite the fact that such notices were routinely sent to other vendors, and admitted he had not produced a copy of the alleged notice. *See* T 256:17-258:3[6]; 443:7-20

55.     The lack of notice was critical, because it not only undermined its credibility and relationships with the Contractors because Predictive was prevented from providing services to its subscribers during that time, but also damaged Predictive's business interests beyond the scope of the Dwyer franchises. T:435-2-21; D24, D25, D26.

56.     When Dwyer authorized CareerPlug to post jobs for Mr. Electric and Glass Doctor, Indeed.com mistakenly believed Predictive knew it was posting jobs without authorization and shut down Predictive's feeds for all franchise brands as result. *See* D25[7].

57.     Predictive communicated this concern to Dwyer, when its former CIO emailed

---

[5] In this document, in an email dated August 8, 2017 Austin Malone pointedly tells Mary Thompson and Craig Gjeltsen that it "*looks like Indeed isn't accepting listings from Career Plug because the Predictive Profiles agreement exclusive push listings on Dwyer's behalf. Clint is going to contact Indeed to see if there's a solution here. Otherwise, we may need to stop Predictive from publishing listings to Indeed altogether…*"

[6] Carla Bainbridge testified she never received any notice from ProTradeNet. *See* T 394:10-13

[7] Pointedly, this email dated August 21, 2017 placed Dwyer on notice that their actions "effects [sic] your other brands that you are not testing Career Plug with, along with our other customers that are on this feed."

PREDICTIVE'S POST TRIAL
                                                                                    PROPOSED FINDINGS
                                                                                   OF FACT AND LAW

Mary Thompson saying:

> "This all makes us look bad to say the least, despite the fact that we had all of our bases covered and adhered to all quality standards throughout our partnership. I certainly hope it was made clear to Indeed from whomever at Dwyer Group contacted them that this was being done behind our backs and we were going to continue listing the jobs as we had no idea the permission and authorization had changed. And hopefully we can work with their quality team to get back on track."

*See* D25.

58.     Later that evening, Predictive reiterated this position in a separate email exchange,

highlighting, again, Indeed.com's strict guidelines and prohibition against double-posted jobs.

> "As we had mentioned several times, Indeed is very very strict on their quality guidelines, and as I said I sincerely hope it was communicated to Indeed that this was done behind our backs, because otherwise Indeed will [understandably] assume that we were given the heads up and remove those (Glass Doctor and Mr. Electric) from the feed. But since we had no idea, we were still including those jobs in the feed. I still don't know at this point if I should remove them or if they're handling it on their end, because we were not involved in the discussion as to if they can suppress them on their end without it affecting the quality rating of our feed."

*See* D26.

59.     Dwyer never responded to these requests and the subsequent loss of the Indeed.com

feed for three weeks is strong evidence Dwyer sat on its hands and took no steps to ameliorate this

disaster for its franchisees.  *See* T 448:11-21; D28.

60.     Predictive properly attributed the loss of its Indeed.com feed – and the disruption

to its business as a result – to a lack of notice from ProTradeNet and Dwyer.  Ms. Bainbridge

testified at length on the issue, saying:

> Because Mary, and I -- when I say Mary, I'm just not pointing just at Mary, but Mary and her team took down two brands from the feed. So without notice. We didn't know. So overnight we're not in compliance with the Indeed qualifications -- quality qualifications. So then Indeed took our entire feed down. And when I say our entire feed, I'm not talking just Dwyer. All of our customers. So we woke up one morning and went, oh, my word. Indeed's calling. They took our feed down. Why? What happened? We had no idea this was going on. We were not given any

PREDICTIVE'S POST TRIAL
                                                    PROPOSED FINDINGS
                                                    OF FACT AND LAW

notice. Had we been given notice, we could -- because the reason we would need to have notice is because now all of a sudden there's duplicate jobs, right? And so Indeed is questioning what we're doing. Why are you feeding us jobs and why is Career Plug feeding us jobs for two brands? And had we had notice, we would have just taken down our jobs for those two brands and there would not have been a conflict. It was really a simple situation that made it terrible for us for three weeks and our integrity with our partnership with Indeed.

*See* T 419:6-24

61.     Bainbridge elaborated, testifying that, had Predictive received proper notice of the change, it could have removed Mr. Electric and Glass Doctor from its XML feed and avoided the problem entirely.  *See* T 420:3-17.

62.     The second breach was a "slow burn," beginning in October 2017 and culminating December 19, 2017.  First, Contractors reported they were not receiving emails from Predictive. However, after investigating, it was clear the notification emails were sent from Predictive's system, but not being routed by Dwyer's servers. T 450:11-22, *see, also* D29[8].

63.     During this time, the Vendor Agreement was still in effect, yet it is clear Dwyer was, behind the scenes, undermining Predictive's business with the Contractors while simultaneously lining up its replacement, CareerPlug.

64.     Thereafter, on December 19, 2017, Predictive learned Dwyer had ordered Indeed.com to suppress all the Predictive job feeds without notice: Predictive lost numerous customers, which prompted an internal investigation. *See* T 458:11-21, D30.

65.     Indeed.com confirmed that they were not blocking Predictive's feed, but they had "already received confirmation from Mary that the Dwyer Group jobs should be prioritized from a different ATS."  That "different ATS" was CareerPlug.  *See,*  D22, D27, D30 D31.

---

[8] This October 12, 2017 email from Bainbridge to Thompson identifies the problem and seeks a simple resolution, which never came.

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW

66. The transition was long-planned and intentionally kept from Predictive. On August 31, 2017, Gjeltsen emailed other Dwyer Group personnel regarding the transition from Predictive to CareerPlug, saying "we are moving forward with making CareerPlug the system of record at Indeed for all brands. <u>This is not for publication for the franchisees at this time.</u>" Gjeltsen further notes "Indeed…only allows one "Registered Agent" to send jobs to their platform. That was Predictive Profiles previously and is now CareerPlug." It was clear franchisees could continue to use Predictive's services, but only for a limited time and actively discouraged from signing long-term contracts. *See* D27.

67. By September 1, 2017, Thompson directed Indeed.com to authorize CareerPlug as the System of Record for Glass Doctor, Mr. Electric, Aire Serv, Five Star Painting, Grounds Guys, Mr. Appliance, Mr. Rooter, Rainbow International, and Window Genie. *See* D31 (PTN002133).

68. Evidence admitted at trial makes clear that, but for internal confusion *at Indeed.com*, Predictive would lost access to the Indeed.com feed – and the benefit of its bargain – months earlier. *See* D31.

69. Ultimately, Indeed.com was successful in resolving its internal issues on or about December 19, 2017, the day Predictive first learned it was, again, shut out. *See* T 458:11-21.

70. At that time, Predictive was effectively out of the Dwyer business, because "the franchise owners were in disarray, upset and didn't like [Predictive] much." T 510:25-511:1.

71. Within a matter of weeks, ProTradeNet issued its January 12, 2018 Notice of Termination. *See* P74.

72. There was also a third breach, intimately tied to the prior two: ProTradeNet was contractually obligated, throughout the effective term of the Vendor Agreement, to promote Predictive's services and recommend them to the many franchisees in its various brands. By

removing Trading Partners without notice *and shifting them to other, competitive providers like CareerPlug*, ProTradeNet breached its duty to promote and recommend Predictive's services to the franchisees in those systems. That is, in August 2017 when Glass Doctor and Mr. Electric were transitioned to CareerPlug, that represents a failure to promote Predictive's services and recommend them to the franchisees for those brands. Likewise, the behind-the-scenes machinations to remove the remaining brands, which was started in September 2017 and not completed for nearly three month, represents a further breach of this provision. *See* P72 § 2.1.

73. ProTradeNet has argued Predictive's services were non-exclusive[9] based on the express language in the Vendor Agreement, which entitled them to seek out and retain additional providers for services competitive to Predictive's. ProTradeNet further argues the non-exclusive nature of the Vendor Agreement permits it to promote competition and utilize competitive vendors for the benefit of the franchisees.[10] However, trial testimony elicited from Craig Gjeltsen makes clear that, at least with respect to a universal and uniform hiring platform and ATS provider for its many brands, like Predictive, ProTradeNet only works with one vendor at a time. *See* T 275:3-276:7.

74. Strikingly, Gjeltsen admitted that, while there were other vendors in the past, currently, the "RAREToolbox"[11] <u>only</u> uses CareerPlug for applicant tracking and online hiring. Gjeltsen testified that, despite testimony from his colleagues about multiple vendors in competition as part of the ProTradeNet business model, but with respect to online applicant hiring and tracking, "there's one primarily that the brands are using as an initiative…" *See* T 275:3-12, T 275:17-18.

---

[9] Luke Stanton admitted the term "non-exclusive preferred supplier" is not a defined term in the Vendor Agreement. *See* T 256:11-13.
[10] Stanton testified that the "marketplace is more competitive when we bring in two or three suppliers within a category." *See* T 228:13-15.
[11] Dwyer's Recruiting and Retention Employee Toolbox. *See* T 11:25-12:1.

75.    Gjeltsen admitted currently there was **only the one approved vendor**, CareerPlug, but "franchisees are welcome to use any vendors they want to." T 275:18-276:7.

76.    The Court must find, therefore, that during a time when the Vendor Agreement was in effect, ProTradeNet and Dwyer removed two Trading Partners from Predictive's service without notice in order to test out a competitive system. In so doing, they interfered with Predictive's business by damaging its working relationship with Indeed.com and the Contractors. Moreover, and despite assuring Predictive it could keep its listings for several brands (Mr. Rooter, Aire Serv, Grounds Guys, Window Genie, Rainbow International, Five Star Painting, and Mr. Appliance), in reality ProTradeNet and Dwyer were working with CareerPlug and Indeed.com to shift **all** of those brands to CareerPlug just days later and without notice to Predictive. *See* D31 (PTN002133).

77.    The Court must find the foregoing material breaches of the Vendor Agreement defeat ProTradeNet's breach of contract claim because ProTradeNet cannot satisfy its burden of proof with respect to the second element of the test found in *Line-X Franchise Dev. Corp. v. Schultz*.

78.    Despite the foregoing, ProTradeNet did not send the January 12, 2018 Notice of Termination (P74) until well after the parties' business relationship was irrevocably damaged. ProTradeNet was required to send the notice 90 days in *advance* of the termination of the business relationship (P72 § 1), not several weeks after mounting a stealth campaign to destroy Predictive's business with its franchisees.

## G.    Predictive Profiles is Entitled to Recover for Breach of Contract

79.    Predictive performed its obligations under the terms of the Vendor Agreement, because it provided the services to franchisees, in the method required by Dwyer and ProTradeNet, and did so at a reasonable price. *See* P72 § 3.

80.     At trial, ProTradeNet and Dwyer paraded several witnesses through the courtroom who testified that Predictive's open recruiting model was, perhaps, "annoying" and at times unwanted, but at no point did the Court hear Predictive failed to offer the services it promised.[12]

81.     While it may be that Predictive's services were ultimately not the best fit for Dwyer and its franchisees, a poor fit with a vendor partner is not, however, sufficient to establish a breach of contract. It is without question true that Dwyer, ProTradeNet, and the various Trading Partners got exactly what they bargained for:

82.     For example, Mary Thompson testified that Dwyer, ProTradeNet, and all their franchisees were well aware of the open recruiting model from the beginning of the relationship and Predictive never failed to deliver on the open recruiting model, and admitted Predictive was truthful about how it would provide applicants to the Contractors. *See* T 115:6-25, 116:3-9, 116:14-21. Matt Kunz admitted that his franchise, Five Star Painting, had some franchisee complaints relating to the frequency of applicants who were not necessarily wanted, but the brand suffered no actual damages as a result. *See* T 147:9-25; 148:1-3. Craig Gjeltsen testified that Rainbow International suffered no damages as a result of Predictive's business practices. *See* T 277:15-24.

83.     Pointedly, the 90 day termination provision in the Vendor Agreement was designed for just such an eventuality. Luke Stanton testified that, ". . . it's to our benefit and the benefit of our franchisees if we have a contract that allows us to terminate. If there's non performance [sic], if they're not getting engagement, we are putting forth a tremendous amount of resources and we have to recoup those resources." *See* T 232:2-9.

---

[12] Rainbow International franchisee, Stacey Casey, testified she found the open recruiting model "annoying" because, for example, a prospective employee came to her business in person, resume in hand for a position she'd already filled. *See* T 216:15-25.

PREDICTIVE'S POST TRIAL
                                                                        PROPOSED FINDINGS
                                                                        OF FACT AND LAW

84.    Likewise, the Contractors who testified likewise admitted Predictive provided the services it promised.  Jay Van Deusen, a Rainbow International franchisee, testified he knew jobs postings were out there for his location and searchable on the web.  *See* T 153:1-5.  Van Deusen explained he paid a one-year subscription for the service, and did not cancel it or renew once the term was up. *See* T 162:2-9.  He thought Predictive's service was "really cool" and an "excellent way of vetting employees," but the model ultimately did not work for his business.  *See* T 167:25-168:11. Van Deusen also testified that, when he had problems with applications coming in for jobs that were not open, he was disappointed with *Rainbow International* for being "part of any kind of information that's undermining my success as a franchisee."  *See* T 153:21-23.

85.    No franchisee testified to suffering any damages as a result of Predictive's business practices or the services they received from it.  *See* T:166:11-167:2; 231:16-24.  Both franchisees admitted they never stopped paying royalties, sent a default notice to their franchisor, or contemplated selling their business as a result of Predictive's business practices. *See* T 167:10-21; 221:6-18; 222:317.

86.    Conversely, ProTradeNet failed to perform its obligations under the Vendor Agreement, as set forth in paragraphs 49-83 above.

87.    Predictive presented evidence of its damages which it suffered as a result of ProTradeNet and Dwyer's actions.  Carla Bainbridge testified that Predictive suffered actual damages of roughly $328,900[13] and lost profits of approximately $3.644 million.  *See* T 480:6-11, *see, also*, D35.  In addition, Bainbridge testified that Predictive paid $62,000 to Self Management

---

[13] Bainbridge specifically testified to the following categories of damages:  (1) $266,900 for website design and development, as well as webinars and training for Trading Partners and Contractors; (2) $340,000 for salaries for four individuals charged with supporting the Program for 14 months; and (3) $3,037,5000 in lost future revenue.

PREDICTIVE'S POST TRIAL
                                                                   PROPOSED FINDINGS
                                                                    OF FACT AND LAW

Group ("SMG"), a third party software company who maintains part of Predictive's online assessment tool.[14]  *See* T 482:12-23, 486:14-487:8; Ex. D36, D37.

### H.   <u>Predictive Has Proven ProTradeNet and Dwyer's Tortious Interference</u>

88.     There is no dispute that the Vendor Agreement was a contract.  However, and to the extent ProTradeNet has argued it was not "subject to interference," the evidence established at trial makes quick work of that contention.  As noted in Section I(B), above, ProTradeNet repeatedly breached the Vendor Agreement and those breaches interfered with Predictive's agreements with its Contractor clients.[15]  Briefly, ProTradeNet removed two Trading Partners from Predictive's service without notice, in violation of the Vendor Agreement. *See* P72 § 7.

89.     ProTradeNet's removal of these Trading Partners also amounted to a material breach of its obligations to promote and recommend Predictive's services, a violation of § 2.1 of the Vendor Agreement, as well.  Finally, ProTradeNet failed to issue a timely notice of termination before taking these drastic steps, depriving Predictive of the opportunity to protect itself and its clients from harm.  Then, a few weeks later, ProTradeNet removed the remaining Trading Partners without notice, triggering a near-total loss of Dwyer-related business to Predictive.  These actions were deliberate and intentional, as evidenced by ProTradeNet and Dwyer's months-long shadow efforts to undermine Predictive's business model and back-channel work with its rival and competitor, CareerPlug to supplant Predictive's Indeed.com feed.  *See, e.g.* D16, D24, D25, D26, D30, D31.

90.     There can be no serious question in the Court's mind that ProTradeNet acted with the intention to interfere with Predictive's business.  As a threshold matter, Predictive

---

[14] SMG's module is exclusively licensed to Predictive.  *See* T 372:1-3.
[15] In addition, Predictive's business with third parties was also impacted.

PREDICTIVE'S POST TRIAL
                                                                PROPOSED FINDINGS
                                                                OF FACT AND LAW

demonstrated at three week interruption in its ability to post jobs to Indeed.com. This loss was solely and entirely attributable to ProTradeNet (with Dwyer's assistance), who clearly knew Indeed.com had strict job posting guidelines, and knew duplicate posts would result in Predictive's feed being shut down, but chose not to warn Predictive of their plans. More, the December 19, 2017 shutdown and suppression of Predictive's Indeed.com feed essentially killed off Predictive's business with Dwyer group franchisees. *See* T 448:11-21; D25, D26, D28, D31.

91.     With respect to damages, Predictive entered testimony and documentary evidence establishing that, prior to ProTradeNet's interference, Predictive had achieved a total of 733 subscribers, which after such interference was reduced to virtually nothing. Predictive has lost the value of those monthly subscriptions, at $45 per month. *See* T:344:14-15, 462:16-22; *see, also* D32.

## I.     ProTradeNet and Dwyer Tortiously Interfered with Predictive's Prospective Agreements with the Contractors

92.     There was a reasonable probability Predictive would enter into contractual relationships with additional Contractors. The Vendor Agreement granted Predictive "preferred" vendor status to every Contractor within the numerous Trading Partners receiving its services, estimated to be ~2600 individual businesses. Based solely on Predictive's position as Dwyer's "partner" in the job applicant assessment process (as stated by Mary Thompson when she introduced Predictive to the Contractors publicly at Reunion 2016, captured on video at the event), Predictive understood and reasonably expected it would obtain significant uptake from those Contractors and that ProTradeNet (and Dwyer) would continue to encourage and recommend its services to the Contractors. *See* P72 § 2.1.

93.     Indeed, Bainbridge testified she was personally advised by Mary Thompson that Predictive could reasonably expect 75% of the Contractors to sign up. T 315:11-18. Further, Craig

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW

Gjeltsen's admission that ProTradeNet has only one approved vendor for cross-brand, online hiring and applicant tracking at a time strongly indicates that Predictive was the only game in town before ProTradeNet and Dwyer went behind its back to bring in CareerPlug and steal its business away. *See* T 275:3-276:7[16].

94. At trial, Predictive proved that ProTradeNet and Dwyer's actions were *designed* to obscure from Predictive the move to CareerPlug as their "preferred" vendor. *See* D 22, D27, D30, D31. ProTradeNet and Dwyer's actively discouraged hundreds of Contractors from signing up for Predictive's services by causing a three-week interruption in Predictive's ability to post jobs to Indeed.com in August 2017, suppressing candidate notification emails to Contractors in October 2017, and finally by suppressing Predictive's Indeed.com feed permanently in mid-December 2017. *See* T 60:12-61:7, 256:17-258:3; T 394:10-13, 419:6-24, 435-2-21, 443:7-20, 448:11-21, 450:11-22, 458:11-21; D22, D24, D25, D26, D27, D28, D29, D30, D31.

95. The campaign was an unmitigated success: by December 2017, "the franchise owners were in disarray, upset and didn't like [Predictive] much." *See* T 510:25-511:1. Predictive's business with the Dwyer brands was effectively over, though ProTradeNet did not issue its Notice of Termination for another four weeks. *See* P74.

96. These are not "sharp" practice: taken together, they describe a wide-ranging, months-long fraud. ProTradeNet and Dwyer knew they were misleading Predictive, and intended Predictive to believe their misleading statements while ProTradeNet and Dwyer maneuvered behind the scenes to deprive Predictive of its status without notice. *See* T 60:12-61:7, 256:17-258:3; T 394:10-13, 419:6-24, 435-2-21, 443:7-20, 448:11-21, 450:11-22, 458:11-21; D22, D24,

---

[16] This, of course, contradicts the testimony of Luke Stanton, who claimed ProTradeNet maintains competitive vendors in each category. *See* T 10:7-9.

D25, D26, D27, D28, D29, D30, D31. For these reasons, the Court should find no material facts in dispute with this element, and further find Predictive has carried its burden with respect to this element as a matter of law.

97.     ProTradeNet and Dwyer knew their lies and behind-the-back dealings with CareerPlug would interfere with Predictive's ability to continue servicing its existing Contractor clients and gaining new ones into the future, as originally contemplated by the parties. There is no other, reasonable explanation for ProTradeNet and Dwyer's months-long cover-up of the switch to a rival provider ahead of ProTradeNet's breach of the Vendor Agreement, other than to interfere with Predictive. *See* T 60:12-61:7, 256:17-258:3; T 394:10-13, 419:6-24, 435-2-21, 443:7-20, 448:11-21, 450:11-22, 458:11-21; D22, D24, D25, D26, D27, D28, D29, D30, D31.

98.     ProTradeNet and Dwyer will likely argue they had the right to change vendors per the Vendor Agreement, but this argument misses the mark because ProTradeNet materially breached the Vendor Agreement. Indeed, the breach was wholly unnecessary: if ProTradeNet and Dwyer legitimately sought only to switch providers, ProTradeNet could have terminated the Vendor Agreement at any time, for no reason whatsoever, on 90 days' notice. See P72 § 1. That ProTradeNet did not exercise its rights under the Vendor Agreement is particularly damning evidence supporting Predictive's claim that ProTradeNet, and by extension Dwyer, intended to hide their actions from Predictive for as long as possible precisely because their motivation was tortious, and not justified.

99.     Finally, the nexus between ProTradeNet and Dwyer's conduct and Predictive's damages is clear: but for their interference and fraud, Predictive would have continued servicing more than the ~730 Contractors it lost and almost certainly would have signed up additional Contractors, as well. Predictive has provided documentation detailing the losses it reasonably

incurred as a result of ProTradeNet and Dwyer's tortious interference based on Thompson's oft-repeated goal of 75% adoption by all of Dwyer's Trading Partner's Contractors.

100.    Predictive has provided a calculation of its damages out to three years, based on the commitment of 75% of the ~2500 franchisees in the service population, which amounts to $3.644 million.  The Court should, based on the foregoing, award Predictive it's damages in that amount.

**J.      ProTradeNet Has No Damages**

101.    Even if the Court does not find ProTradeNet's numerous breaches of the Vendor Agreement were material and moot its claim against Predictive – which it ought not do – ProTradeNet has failed to establish its damages for Predictive's alleged breach.

102.    The record shows that not one witness testified to <u>any</u> damages actually suffered by ProTradeNet. Mary Thompson, the only witness who testified to any actual damages, limited her discussion entirely to *Dwyer's* damages.  As Ms. Thompson testified, "…in addition to the damages suffered by ProTradeNet, I wanted to calculate the time spent that we worked with Predictive…" *See* T 99:23-24.

103.    However, other than a passing reference to damages, no evidence relating to any loss suffered by ProTradeNet was admitted into evidence.  On the other hand, Luke Stanton testified that Predictive provided no financial benefit whatsoever to ProTradeNet. *See* T 267:16-18.  Predictive did not produce rebate revenue for ProTradeNet, as many vendors do.  *See* T 2455:4-14.

104.    In light of the foregoing, this Court must find ProTradeNet has no damages and has, therefore, failed to meet its burden with respect to proving it is entitled to recover on its breach of contract claim.  Therefore, ProTradeNet is not entitled to relief as a matter of law.

105.

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW

### K.  ProTradeNet is Not Entitled to Injunctive Relief as a Matter of Law

106.   Even if the Court were to find in ProTradeNet's favor on its breach of contract claim – which it ought not do for the reasons set forth elsewhere herein and in Predictive's Motion for Partial Summary Judgment, incorporated herein by reference – ProTradeNet is not entitled to the injunctive relief.  ProTradeNet's made no claim that it would suffer an irreparable harm, in any way, by the Predictive's continued servicing of Contracts who remain its clients.  Nor did ProTradeNet offer any evidence it was harmed by Predictive.  Injunctions are intended to prevent damages which cannot be addressed by money alone, but in the absence of any proof of damages, monetary or otherwise, this Court must deny ProTradeNet its relief.

107.   Further, ProTradeNet's material breaches of the Vendor Agreement damaged Predictive by depriving it of the benefit of its bargain.  ProTradeNet's hands are unclean, and this Court should deny its prayer for injunctive relief on that basis, as well.

### L.  Dwyer is Not Entitled to Recover for its Counterclaims

#### 1.  *Dwyer Has Failed to Prove Predictive Infringed on its Marks*

108.   At trial, it was clear Dwyer failed to prove the essential elements of its counterclaims against Predictive.  Dwyer failed to provide evidence that consumers were likely to be confused by Predictive's websites and no evidence was offered to support a finding by this Court that Predictive engaged in cybersquatting.  For the foregoing reasons, the Court should enter judgment in Predictive's favor and deny relief to Dwyer on all three claims.

109.   Dwyer failed to produce evidence that the relevant class of consumers was confused: indeed, it failed to produce evidence that *anyone* was confused by Predictive's allegedly infringing use of its marks.  Here, the relevant consumers are the Contractors, because Predictive's services are sold exclusively to them. To the extent Dwyer argues the general public or the subset

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW

of the general public applying for jobs are the relevant class, it is mistaken. The general public, if confused at all (and there is no proof of any such confusion), is irrelevant because there is no claim of post-sale confusion.

a. <u>The Strength and Similarity of the Marks</u>

110. Predictive concedes Dwyer's marks, which are registered with the USPTO, are sufficiently strong. Predictive used Dwyer's marks with permission and at all times in good faith, either subject to the Vendor Agreement or the Agreed Order on Motion for Preliminary Injunction, and did not seek to register those marks for itself, or any marks which are remotely similar thereto. Dwyer presented no evidence showing Predictive did anything other than own and maintain websites dedicated to one purpose: helping Dwyer franchisees onboard applicants through their online portal. *See* P76.

111. As Carla Bainbridge testified, Predictive's use of the marks in question was limited to providing a means of identification for prospective employees to understand the name and nature of the franchised business to which they were applying. *See* T 288:8-10 ("…we took the logos off. We left the name of the company because obviously you have to do that or people won't know who they're applying to."), 290:19-21 ("we had no intention of causing any harm. We had an intention of continuing to service our clients.") Dwyer neither produced documentary evidence, nor entered testimony which could lead this Court to find Predictive has claimed ownership over Dwyer's marks, or has made marks of its own which are competitive thereto.

112. Predictive's use of Dwyer's marks was, as previously noted, permitted by this Court. *See* Dkt. No. 42. Therefore, and because the marks themselves are identical, the proper inquiry is focused on *how the relevant consumer comes across the mark in commerce.*

113. The only evidence of any "use or display" of Predictive's use of Dwyer's marks,

which Dwyer claims infringed on its marks, was in the form of the websites it maintained for the Contractors' (and ultimately Dwyer's) benefit[17]. *See* P37[18], P76, P89. Per ProTradeNet's April 17, 2018 correspondence (P75), Predictive was ordered to take down "all urls using brand names (i.e. http://applyatairserv.com)...by the end of the day, Wednesday, April 18, 2018." This led to the creation of the generic "applyatsites," which were registered and live on April 19, 2018. *See* T 289:19-290:13; *see, also* P76.

114.     Predictive was, however, permitted to continue providing its services to the Contractors who wished to use its services. *See* P75. Therefore, Predictive's generic "applyatsites" were designed – for the benefit of those same Contractors – to be virtually identical to the original, branded pages which were taken down. As Carla Bainbridge repeatedly testified, "[t]his is a site that is designed for our clients to be able to use so that they can have applicants continue to apply through that site…" *See* T 294:17-19; 292:12-14. Predictive further understood it was permitted to use the sites for that purpose pursuant to the Agreed Order on Motion for Preliminary Injunction dated December 4, 2018. *See* P36.

> b.     There is No Similarity Between Dwyer's Brands and Predictive's Services

115.     Dwyer's Trading Partners operate separate franchise brands, each with its own set of individually-owned franchise units. Mary Thompson testified that ProTradeNet, Dwyer, or any of the Trading Partners owned and/or operated their own applicant tracking systems or online hiring platforms. *See* T 112:17-24, T 112:25-113:9. Thompson affirmed that the "reason why [Dwyer] sought out Predictive Profiles to create a job portal is because [Dwyer doesn't] do that

---

[17] Predictive has generally referred to these as the "applyatsites"

[18] This exhibit contains images of Predictive's internal, franchisee-only websites which are the portals used by Contractor clients to access Predictive's services.. For example, "windowgenie.predictiveprofiles.com"

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW

work…" *See* T 113:10-13. Thompson further testified that, unlike Predictive, Dwyer's brands are engaged in home care and repair, or as she put it "repair, maintain, and enhance." *See* T 113:14-17. Likewise, Mary Thompson testified that Predictive does not offer similar services to Dwyer or its brands. *See* T 113:22-25.

116.    Predictive has never mislead the Contractors as to its affiliation, and even if it did, Dwyer has gone to great lengths of its own volition to ensure the Contractors would know Predictive was no longer a preferred vendor. Indeed, on April 13, 2018, each Trading Partner sent out a near-identical, mass email to each Contractor specifically stating that "Predictive Profiles relationship with ProTradeNet has been terminated, and therefore Predictive Profiles is no longer a PTN or preferred vendor." *See* P43, P44, P45. At trial, Mary Thompson testified that on April 13, 2018, "Dwyer or ProTradeNet…sent out a message via email to every franchisee in their system" which made it "very clear that Predictive Profiles was no longer the preferred vendor." *See* T 105:21-109:12.

117.    The Contractors are fully familiar with Dwyer's corporate configuration and the existence of ProTradeNetwork and the goods and services it offers. Contractors know that ProTradeNet exists to, essentially, increase franchisee-level buying power by leveraging the power of the brands. *See* T 226:10-16. The Contractors are also aware that Predictive was introduced to them because it offered a service their respective brands, and Dwyer itself, did not. With respect to the allegedly infringing websites themselves, each of the generic "applyatsites" contains a disclaimer which reads as follows:

> I acknowledge that I am applying for employment with an independently owned and operated [Trading Partner] franchisee, a separate company and employer from [Trading Partner] and any of its affiliates or subsidiaries. I understand that each independent franchisee is solely responsible for all decisions relating to employees including and without limitation hiring and termination, and [Trading Partner] does not accept, review or store my application. Any questions about my application or

the hiring process must be directed to the locally owned and operated [Trading Partner] franchisee.

*See* P76, pp. 1, 6, 11, 16, 21, 26, 21, 36, 41.

118.     The disclaimer makes clear to Contractors the websites themselves are application portals unaffiliated with the Trading Partners and, by extension, Dwyer.  This was reinforced by the emails sent to all Contractors prior to the creation of these websites.  *See*, D43, D44, D45. Critically, Dwyer presented no evidence whatsoever from any franchisee who was unclear as to Dwyer's corporate configuration or the ProTradeNet program.

119.     The inescapable truth, admitted by Mary Thompson and supported by the record adduced at trial, is that Predictive's services are in no way competitive with *any* service offered by *any* Dwyer Trading Partner.  Moreover, it is equally clear that Predictive's business is in an entirely separate industry from those offered by Dwyer and its brands.  Nor are those brands likely to move into Predictive's territory in the future, because they have CareerPlug as their preferred vendor[19].  *See* T 249:6-11. Here, the evidence solidly shows it would be unreasonable for any Contractor to believe Dwyer, or one of the Trading Partners, was going to encroach upon Predictive's business because it has contracted with CareerPlug for those services, instead.

c.     Predictive's Use of Dwyer's Marks was Altruistic

120.     Dwyer produced no evidence to show Predictive's intent was anything other than accurately providing information about the source of open jobs to interested applicants on behalf of the Contractors. As Carla Bainbridge testified, Predictive's use of the marks in question was limited to providing a means of identification for prospective employees to understand the name and nature of the franchised business to which they were applying. *See* T 288:8-10 ("…we took

---

[19] And, as noted above, CareerPlug appears to be the exclusive provider of applicant tracking and online hiring for ProTradeNet and Dwyer since replacing Predictive in late 2017.

the logos off. We left the name of the company because obviously you have to do that or people won't know who they're applying to.", 290:19-21 ("we had no intention of causing any harm. We had an intention of continuing to service our clients.")

121. Beyond those words, the generic "applyatsites" themselves show that, in all cases, where Predictive used Dwyer's marks, they properly denote the source of the posted job and each page contains a conspicuous disclaimer identifying the mark holder at the bottom of the page[20]. *See* P76 pp. 1, 6, 11, 16, 21, 26, 31, 36, 41.

122. Conversely, none of these allegedly infringing webpages contain *Predictive's* name. To the extent job applicants use these webpages to apply for a job with a local, independently-owned Contractor found through hosted job postings on websites like Indeed.com, they are not Predictive's "consumers" – they are not purchasing the services Predictive provides and, indeed cannot purchase them, and know they are applying for a job with a local, independently owned franchisee, not purchasing a service.

> d.    Dwyer Has Failed to Establish Actual Confusion

123. There is no actual confusion in the relevant marketplace. At best, Dwyer introduced testimony of two franchisees who complained they did not like receiving applications when they were not looking for new employees. For example, Ms. Casey found Predictive's open recruiting model "annoying," while Mr. Van Deusen generally praised it, believing it was "really cool" and an "excellent way of vetting employees," but the model ultimately did not work for his business. *See* T 167:25-168:11. Dwyer produced no evidence of any market studies or other independent research into whether anyone was confused. Indeed, they never bothered to commission such a

---

[20] Strikingly, these disclaimers were required by *Dwyer's* legal team for the express purpose of ensuring the public would not confuse the websites as being owned, operated, or affiliated with Dwyer or its brands. *See* T 370:6-13, 21-371:1; D7

PREDICTIVE'S POST TRIAL
                                    PROPOSED FINDINGS
                                    OF FACT AND LAW

study as to how the market views the generic websites. *See* T 259:10-13. Nor did Dwyer conduct an independent investigation into whether consumers were confused by Predictive's websites. *See* T 259:14-261:23.

124.    It cannot be understated that Predictive was not prohibited *at any time* from providing its services to the Contractors. Mary Thompson testified that, after the Notice of Termination was issued January 12, 2018, the franchisees were free to use its services and Predictive was entitled to provide those services. *See* T 119:3-12. Thompson acknowledged that it is necessary for Predictive to identify who the applicant is submitting to, as well. *See* T. 119:13-16.

### e.      The Digits of Confusion Overwhelmingly Favor Predictive

125.    On balance, the foregoing factors weigh in Predictive's favor. Predictive used Dwyer's marks subject to permission – first by Dwyer itself, and later through the limited licenses enjoyed by its client Contractors and the Agreed Order entered by this Court. Though the marks themselves are similar, Predictive provides services solely to Contractors in a market Dwyer and the Trading Partners do not participate in, and are unlikely to enter in the future. Predictive's acted in good faith and with Dwyer's Contractor's best interests in mind. Dwyer has no evidence of actual confusion in the marketplace, because there is none, despite the fact that Predictive provided its services to the Contractors for nearly three years. Therefore, and in light of the absence of material facts which could move the Court to find otherwise, this Court grant judgment in Predictive's favor and find there is no trademark infringement under 15 U.S.C. § 1114(1), Section 32(1) of the Lanham Act.

### f.      Dwyer Has No Damages for the Alleged Infringement

#### 1.      *Dwyer Has No Actual Damages*

126.	As a threshold matter, Dwyer admitted at trial it has no actual damages for infringement.  Mary Thompson admitted there was no evidence supporting a claim for actual damages for the alleged trademark infringement. *See* T 114:1-115:5.  In particular, she admitted Dwyer never investigated whether it had actual, financial damage to itself or its brands as a result of the Franchise Times article. *See* T 114:18-21.  Ms. Thompson also acknowledged Dwyer had dealt with the concerns of its franchisees without expense: the franchisee complaints were handled by phone.  *See* T 112:6-16.  Similarly, Matt Kunz testified his franchise suffered no damages as a result of Predictive's business. *See* T 147:9-148:3.  Similarly, Craig Gjeltsen confirmed no damage to Rainbow International's. *See* T 277:15-24. To the extent Dwyer was damaged at all, those damages were related *solely* to "time spent working with Predictive to improve their system." *See* T 99:24-25.  These damages, as noted above, were not supported by any documentary proofs and the basis for those calculations remains a mystery.

127.	Mary Thompson admitted that Dwyer conducted no investigation into the scope of the alleged damage to Dwyer's reputation as a result of the Franchise Times article, beyond talking to their own franchisees informally.  *See* T 111:18-23.  Nor did Dwyer engage in any market research into whether Dwyer or ProTradeNet's name was damaged. *See* T 111:24-112:1.  Likewise, Dwyer did not independently investigate, much less verify, whether any of its brands were damaged by the Franchise Times article. *See* T 112:2-5.  In short, Dwyer has no real damages and the Court should find accordingly.

128.	In addition to the foregoing, Thompson admitted Dwyer had spent $0.00 on corrective advertising, despite allegedly suffering for 18 months.  *See* T 122:18-123:7.  Thompson's testimony, however, focused not on helping the brands' reputations recover from negative feedback from the consuming public, but the negative feedback from their own

franchisees who:

> "thought we wouldn't, couldn't and were not doing anything to correct the issue, and when we had other applicant tracking systems that we've offered them, they've had less trust in wanting to use it because they said, I used this one that you recommended and I had these issues, and when I told you I had these issues, I asked for it to be fixed and we couldn't get it fixed because we couldn't get the vendor to make the changes."

*See* T 91:22-92:4.

### 2. *Dwyer's Expert's Opinions Should be Disregarded*

129.    In the absence of any actual damages, Dwyer relied exclusively on its expert, Dr. Charles North, who opined at trial that Dwyer was entitled to two categories of damages: corrective advertising and reasonable royalty. *See* T 175:10-23. North further opined that corrective advertising damages were, at the time of trial $2,893,878, and a reasonable royalty would be $150,000. *See* T 175:18-19, 176:1-2. North's opinions were – and are – objectionable and were the subject of a motion to strike [Dkt. Nos. 81, 82, 83, 94], because North's opinion failed to meet the standards set forth in *Fed. R. Civ. P.* 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 609 U.S. 579 (1993)[21].

130.    Dr. North's qualifications as an expert in trademark infringement and/or unfair competition and/or cybersquatting damages are nonexistent. Dr. Charles North admitted at trial he was not an expert on marketing and advertising, and had not read the cases his report relied upon. *See* T 192:22-193:25. North lacked a full understanding of Predictive's business in general. *See* T 194:1-3. North admitted that he has never testified as an expert in a trademark case and he is not an expert on the law of trademarks. *See* T 196:14-197:8. In short, Dr. North was and is

---

[21] The Court denied this motion [Dkt. No. 106], finding Predictive's arguments addressed the weight of Dr. North's opinions and methodology, and not whether his methods and opinions passed the minimum requirement for admissibility.

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW

utterly unqualified to offer an opinion about the scope or necessity of damages here because he has no independent knowledge relating to the subject matter and relied entirely on Dwyer's counsel for the "methodology" he employed. This renders his opinions utterly unreliable because he lacks the requisite knowledge and expertise to "assist the trier of fact."

131. Separately, Dr. North's testimony was unreliable because it is predicated upon nothing more than Dwyer's self-selected data, which Dr. North admitted he did not review or investigate to ensure it was accurate. *See* T 200:5-25. Dr. North admitted he did not review the learned treatise cited in his report, or the cases he purportedly relied upon, until after the report was issued. *See* T 193:10-17, 201:25-202:6.

### Corrective Advertising

132. Dr. North acknowledged at trial that the basis for his calculations was that he "took the work that had been prepared by Dwyer at that point [and]. . . I took those numbers that they provided for 2018, came up with a total advertising spend for 2018 and then that's what I divided by 12…" *See* T 176:12-19. He admitted he did not apply any generally accepted methodology for his calculation. Critically, and to the Court's lone question "How did you decide on what methodology to use?" North replied he was "asked to assume that this was the correct legal methodology." *See* T 203:7-13. This revelation, alone, should end the inquiry into whether North's opinions are reliable.

133. North further admitted he undertook no investigation to validate the self-selected numbers provided by Dwyer; he merely added up the provided data. *See* T 197:18-20, 201:17-24. Strikingly, North admitted much of his report was drafted by others, including Dwyer's counsel. *See* T 198:9-20. The Court should view this ghostwriting by Dwyer's counsel as a serious issue affecting Dr. North's credibility. Frankly, neither Dwyer nor their counsel are the expert: Dr.

North is the expert and his opinions must be his own and not that of counsel. At his deposition, Dr. North was unable to explain which portions of the report[22] he wrote, versus counsel, who objected to that line of questioning.[23] *See* T 198:15-21.

134. Dr. North's testimony calls into serious question whether his report was drafted by him, and should give the Court pause because the testimony makes clear Dr. North's opinions are *ipse dixit*, but it is Dwyer and their counsel who have given their say-so, nor North. Dr. North did nothing more than take data he was provided, and obtain an average, and then, *solely because he was told to do so by Dwyer's counsel*, divided that number by 25%, then divide it by 12 and multiply it by 18. *See* T 203: 1-5. Contrary to Dr. North's testimony, this is straight mathematics anyone with a calculator could have performed. This is the whole and entire basis for a calculation of damages in excess of $2 million. *See* T 175:18-19.

### Reasonable Royalty

135. Dr. North's testimony on this subject was fraught. Dr. North's testimony starts by assuming the existence of an "alternate hypothetical contract" between Dwyer and Predictive regarding licensing Dwyer's marks outside the ProTradeNet network. *See* T 184:19-22. Dr. North testified, without basis, that Dwyer would not have licensed its marks to Predictive for less than a 20% royalty. *See* T 185:8-9. However, North later admitted there was no policy underpinning this position, but "it's what they say.[24]" *See* T 205:15-17. North applied the *Georgia Pacific*

---

[22] Filed under seal [Dkt. No. 83-1

[23] *See* Dkt. No. 82-1, the North Deposition Transcript at Tr 61:14-64:24. Predictive asks the Court take judicial notice of the record in this regard.

[24] This information goes beyond the scope of the information contained in his report, in which he opines *"…it is my understanding that Dwyer would be entitled to an average 20% rebate…"* *See* Dkt No. 83-1, filed under seal. This unexplained departure undermines Dr. North's credibility and supports the notion that his opinions and report are not based in any valid expertise, but rather conjecture and the parroting of client and counsel's pet theories.

factors to evaluate the reasonable royalty, and acknowledged *Georgia Pacific* was a patent case. *See* T 204:8-20. North also admitted he used *Georgia Pacific* purely because he was directed to do so by counsel. *See* T 204:23-25. North's report does not analyze these factors, and North provided no testimony underpinning this theory from his report.

136. Dr. North's calculation of the reasonable royalty are inexplicable: despite the fact that Predictive <u>never</u> paid a royalty under the Vendor Agreement, his analysis (again using simple mathematics a high school senior of average intelligence could employ) multiplied 1,034 by $495 and then discounted 20% to arrive at his total. *See* T 190:18-191:7. Again, this is a math problem, not an expert-level analysis.

137. Ultimately, Dr. North's conclusions reflect no scientific or other specialized knowledge – they are an expensive math problem based on unreliable data and completed by an unreliable witness. This Court must find Dr. North's expertise lacking, his opinions did not assist the trier of fact, his credibility minimal, and that his opinions carry no weight whatsoever. The Court should discount his opinions and the damages calculations contained therein and refuse to consider them in rendering its verdict.

## L. Dwyer Has Failed to Prove its Claim for Unfair Competition

138. Though Dwyer alleged Predictive engaged in "unauthorized marketing and sale of its products and services in interstate commerce" using Dwyer's marks, which constituted a "false designation of origin or false representation that wrongfully and falsely designates [Predictive's] products and services as originating from or connected with Dwyer," [Dkt. No. 50, ¶ 38] it offered little, if any, evidence to support this claim.

139. First, Dwyer produced no evidence or testimony establishing Predictive engaged in advertising. At best, Dwyer tried to tease such an admission out of Carla Bainbridge, but she did

not rise to the bait. *See* T 290:22-291:6[25], 293:25-294:3. Nor did Dwyer establish that Predictive made any false statements, or that these non-existent false statements deceived anyone. At most, franchisees were annoyed.

140. To the extent Dwyer asks this Court to find Predictive's generically-named websites constitute unfair competition through false advertising, that effort must fail, because Predictive's websites are not "advertisements." The disclaimers prominently displayed on each page make this clear. *See* P76 pp. 1, 6, 11, 16, 21, 26, 31, 36, 41.

141. To the extent Dwyer's unfair competition claim is not limited to a false designation of origin – which is explicitly pled in Count II of the Counterclaim – that claim also fails because Dwyer cannot hope to establish a likelihood of confusion exists. Further, and critically, Dwyer admitted, repeatedly, that it had no actual damages. *See* Section A(6)(a), above. The damages expressed by its expert, to the extent they are admissible and accepted by this Court – and they should not be for the reasons stated above – are strictly tied to the infringement claim, per Dr. North's report and testimony.

### M. Predictive is Not Engaged in Cybersquatting

142. Predictive's *domains* are not confusingly similar to Dwyer's marks. Predictive developed and registered generic domain names, such as "www.applyforhvacjobs.com." None of these registered *domains* are confusingly similar to Dwyer's marks and, in fact, they are wholly generic by design. *See* P76. Predictive registered the generic domains, such as

---

[25] Q. "You had an intention of continuing to solicit applicants nationwide for all positions and then you would email any franchisee in the state whether they wanted a position or not and you would keep doing that until that franchisee say, please stop, right?

A. At this time that is not the case because our Indeed feed had been terminated, suppressed by Mary Thompson. So there were no job postings going on out there.

Q. Well, did you use Monster?

A. No. We don't use Monster.

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW

"www.applyforhvacjobs.com," using intentionally generic and descriptive domain names.

143.     Predictive acted under a good faith belief it was entitled to operate the generic sites in order to continue servicing its then-existing clients.  *See, e.g.*  T 106:6-10; P36, P43, P75. It selected purposefully generic names for its domains, in order to continue servicing clients, which it was expressly permitted to do.  Dwyer failed to introduce evidence to disprove or undermine this position.  In addition, and as set forth at length elsewhere herein, Dwyer proved no damages accrued with respect to this claim.

## II.     <u>CONCLUSIONS OF LAW</u>

### A.     <u>Predictive is Entitled to Recover for ProTradeNet's Breach of the Vendor Agreement</u>

144.     This Court must apply the substantive law of the forum state, Texas. *Chartis Specialty Ins. Co. v. Tesoro Corp.*, 930 F. Supp.2d 653, 663 (W.D. Tex. 2013) (*citing Lockwood Corp. v. Black*, 669 F.2d 324, 327 (5th Cir. 1982)); *see, also Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).  Further, the Vendor Agreement was created under Texas law and contains a choice-of-law provision favoring Texas.  *See* P72.  No party has challenged the enforceability of the choice-of-law provision. Therefore, Texas law governs the Vendor Agreement.

145.     The party seeking enforcement must establish each element of the claim. *See Line-X Franchise Dev. Corp. v. Schultz*, No. H-06-2081, U.S. Dist. LEXIS 99275, *10-11 (S.D. Tex. Aug. 23, 2007) (*citing Marketshare Telecom, L.L.C. v. Ericsson, Inc.*, 198 S.W.3d 908, 923 (Tex. App. --Dallas 2006, no pet.)(emphasis added); *Prudential Sec., Inc. v. Haugland*, 973 S.W.2d 394, 397 (Tex. App. 1998).  Moreover, "[i]t is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Texas, 2017) (*citing Mustang Pipeline v. Driver Pipeline Co.*, 134 S.W.3d

195, 196 (Tex. 2004)). The Texas Supreme Court applies a multi-factor test to determine whether a breach of contract is "material." *Mustang Pipeline*, 134 S.W.3d at 196 (*citing Restatement (Second) of Contracts*, §241 (Am. Law Inst. 1981))[26].

146.     Under Texas law, the "general principle for damages is compensation to [counter]plaintiff for his actual loss resulting from [counter]defendant's wrong." *Chartis Specialty Ins. Co. v. Tesoro Corp.*, 930 F. Supp.2d at 667 (*quoting Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 648 (5th Cir. 1999)). Damages must be specifically alleged: an exact number need not be plead, so long as the evidence provides a "basis for reasonable inferences." *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d at 648 (*quoting Dyll v. Adams*, 167 F.3d 945, 947 (5th Cir. 1999). There must be, at minimum, a "reasonable degree of certainty" to establish damages. *Dyll v. Adams*, 167 F.3d at 946-47. Uncertainty as to the amount of damages is different from uncertainty as to the fact of damages: in the case of the latter, no recovery is permissible. *Id*. at 947.

147.     As set forth in Section I (D) above, Predictive has performed all of its obligations under the Vendor Agreement. Conversely, and as set forth at length in Section I (F) above, ProTradeNet committed multiple, material breaches of the Vendor Agreement, which caused Predictive significant financial losses. Further, Predictive has established its damages: documentary evidence admitted at trial, coupled with the testimony of Carla Bainbridge, established that Predictive suffered actual damages of roughly $328,900 and lost profits of

---

[26] Those factors include: "(a) the extent the injured party is deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of the benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; [and] (e) the extent to which the behavior of the party failing to perform or offer to perform comports with the standards of good faith and fair dealing." *See Mustang Pipeline* at 199

approximately $3.644 million. Therefore, because Predictive has shown by a preponderance of the evidence that it is entitled to recover its damages for ProTradeNet's breach of the Vendor Agreement and has proven its damages to this Court, the Court must award Predictive $328,900 in actual damages and $3.644 million in lost profits.

**B.** **Predictive Is Entitled to Recover for ProTradeNet's Tortious Interference with its Contracts with the Contractors**

148.    Predictive has shown, and the Court must find, ProTradeNet tortiously interfered with its current business relationships and is entitled to relief.  Predictive has shown: (1) the existence of a contract "subject to interference;" (2) the interference was intentional; (3) the interference proximately caused Predictive's damages; and (4) actual damages.  *Deauville Corp. v. Federated Dep't Stores*, 756 F.2d 1183, 1195 (5th Cir. 1985) (*citing Diesel Injection Sales & Services v. Renfro*, 656 S.W.2d 568 (Tex.App. 1983)); *Nova Consulting Group, Inc. v. Eng'g Consulting Servs.*, 290 Fed. Appx. 727 , 737 (5th Cir. 2008) (citations omitted).  Further, contracts terminable at will can support a claim for tortious interference.  *Deauville Corp.*, 756 F.2d at 1195 (string cite omitted).  The business relationship "defined by at-will contracts are intermediate on the continuum whose ends are marked by more inchoate 'prospective business relations' and the more complete relations defined by contracts not terminable at will; Texas law indisputably protects these latter two relations." *Id*. (*citing Terry v. Zachry*, 272 S.W.2d 157, 158 (Tex.Civ.App.1954); *Harshberger v. Reliable-Aire, Inc.*, 619 S.W.2d 478, 481 (Tex.Civ.App.1981)).

149.    With respect to intent, the Fifth Circuit has held with respect to pleading "interference" in the context of tortious interference, the element is satisfied where it is proven that ProTradeNet "acted with intent to interfere with the contract[s]." *See Nova Consulting*, 290 Fed. Appx. at 738 (*citing Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 864 (5th Cir. 2004)

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW

(*citation omitted in original*); *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996)).

150.    As shown in Section I (H) above, ProTradeNet interfered with Predictive's agreements with the Contractors[27] and that interference was intentional and intended to discredit Predictive in order to pave the way for its replacement, CareerPlug.  Likewise, Predictive established at trial that, but for ProTradeNet (and Dwyer's) interference with Indeed.com in at least two instances, Predictive would likely still be providing services to its Contractor clients.

151.    Therefore, this Court should award Predictive $32,985 per month for every month this Court finds ProTradeNet interfered with Predictive's existing business.  Based on the pleadings, the testimony adduced at trial, and the exhibits admitted into evidence, it is clear that ProTradeNet's interference with Predictive's existing business began in July 2017 and continued, unabated, through August 2019, or 26 months.  Predictive needs no expert witness to calculate the total due and owing for ProTradeNet's intentional interference is $857,610, which this Court should award.

## C.    Predictive is Entitled to Recover for ProTradeNet and Dwyer's Tortious Interference with its Prospective Contracts

152.    Predictive has established, and the Court must find, that Predictive is entitled judgment on Count III of the Amended Counterclaim.  Predictive established at trial: (1) a "reasonable probability" Predictive would have entered into a contractual relationship with additional Contractors; (2) that ProTradeNet and Dwyer intentionally prevented, or took steps they knew would likely prevent, those relationships from occurring; (3) that ProTradeNet and Dwyer acts were independently tortious; and (4) actual damages.  *Sanger Ins. Agency v. Hub Int'l, Ltd.*,

---

[27] As well as third parties, like Papa Murphy's

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW

802 F.3d 732, 748 (5th Cir. 2015) (*citing Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013)); *U.S. Enercorp., Ltd. v. SDC Mont. Bakken Exploration, LLC*, 966 F. Supp.2d 690, 702 (W.D. Tex. 2013) (*citing Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*, 219 S.W.3d 563, 590-91 (Tex. App. 2007) (*citation omitted*)); *Royalty Clearinghouse, Ltd. v. CTS Props. Ltd.*, No. 1:16-cv-1342-LY, U.S. Dist. LEXIS 198819, *7 (W.D. Tex. Aug. 24, 2018) (*citing Coinmach*, 417 S.W.3d at 923).

153.    Predictive has established there as "more than a bare possibility that [it] would have entered into a future business relationship" with additional Contractors. *Cooper v. Harvey*, No. 3:14-cv-4152-B, U.S. Dist. LEXIS 111162, * 34 (N.D. Tex. Aug. 21, 2016) (*citation omitted*). Strikingly, "a pre-existing business relationship can suffice to show a reasonable probability of prospective contractual relations." *Id.* (*citing N. Cypress Med. Ctr. Operating Co., Ltd. v. Gallagher Benefit Servs., Inc.*, No. 11-cv-0685, 2012 U.S. Dist. LEXIS 95789, *20-21 (S.D. Tex. July 11, 2012)). In *N. Cypress*, the Southern District held that the plaintiff pled sufficient facts to establish it was reasonably likely it would enter into future contracts with a third party based on an existing relationship with that party. *Id.* Though *N. Cypress* was decided on a different standard (under *Fed. R. Civ. P.* 12(b)(6)), the holding is instructive here, as the Northern District found in *Cooper*.

154.    ProTradeNet and Dwyer's numerous, underhanded actions, taken together, are independently tortious, insofar as they represent a fraud upon Predictive. Predictive need not prove a tort itself, but merely that ProTradeNet and Dwyer's "conduct was actionable under a recognized tort." *Cooper* at *43 (*quoting N. Cypress* at 21). While "sharp" business practices are not actionable, ProTradeNet and Dwyer deliberately mislead Predictive as to the true facts of the situation – that they were taking steps to undermine the Vendor Agreement and oust Predictive

without proper notice – and that these steps were taken with the sole purpose of depriving Predictive of the benefit of its bargain. *See* T 60:12-61:7, 256:17-258:3; T 394:10-13, 419:6-24, 435-2-21, 443:7-20, 448:11-21, 450:11-22, 458:11-21; D22, D24, D25, D26, D27, D28, D29, D30, D31.

155.    Therefore, and for the foregoing reasons, Predictive is entitled to recover its lost profits, which it calculated at trial as $3,644,000.

### D.    ProTradeNet Cannot Recover on its Breach of Contract Claim Because it Materially Breached the Vendor Agreement and Has No Damages

156.    As set forth in Section II(A), the Vendor Agreement is a contract governed by the substantive laws of the State of Texas and each element of the offense must be proven in order to obtain relief. *Line-X Franchise Dev. Corp.* at \*10-11.

157.    As set forth at length in Section I (D) above, ProTradeNet committed serious, and significant breaches of the Vendor Agreement. ProTradeNet's breach of contract claim fails because it repeatedly and materially breached the Vendor Agreement. Indeed, these breaches predate any alleged breach by Predictive and excuse them, if they exist.

158.    The Court must find that, owing to the lateness of the notice, Predictive was not able to enjoy the 90 day termination period in the manner contemplated by the parties at the execution of the relationship.  That is to say, Predictive was already one month deprived from access to posting jobs via Indeed.com for its Contractor clients, and had already lost hundreds of clients (and the opportunity to service hundreds more) because ProTradeNet failed to notify it of Glass Doctor and Mr. Electric's switch to CareerPlug in August 2017 and the removal of the remaining brands December 19, 2017.  The record is clear on this point: ProTradeNet and Dwyer strung Predictive along while they got CareerPlug up and running and then, once all the hurdles were cleared, cut them off at the knees.

159.     Furthermore, and as set forth at length in Section I (J), ProTradeNet has no damages. At trial, ProTradeNet provided the Court with no evidence of any damages it allegedly suffered as a result of Predictive's purported breach.  At best, ProTradeNet claims damages of roughly $21,000 which Mary Thompson admitted were based on documents not produced in discovery and not subject to verification.  T 123:8-25.[28]

160.     For these reasons, ProTradeNet has failed to meet its burden to prove it has performed as required under the Vendor Agreement.  Therefore, the Court must find ProTradeNet cannot recover on its breach of contract claim as a matter of law.

### F.     ProTradeNet Is Not Entitled to Injunctive Relief

161.     Because ProTradeNet is not entitled to recover on its claim for breach of contract as a matter of law, it is not entitled to injunctive relief. *DSC Communs. Corp. v. Next Level Communs.*, 107 F.3d 322 (5th Cir. 1997) (*citing Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982)).  Injunctive relief is an "extraordinary remedy" and should only be granted when a party is truly under threat of damage which cannot be addressed by other means. *Id*. (*citing* Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d*, § 2942 at 43-44 (1995)). For the reasons set forth herein (and above), ProTradeNet failed to meet this burden.

162.     Likewise, the Court must find, because the facts are not in dispute, that ProTradeNet's material breaches of the Vendor Agreement predate the conduct ProTradeNet complains of in the Amended Complaint.  Therefore, ProTradeNet's hands are unclean, and it may not seek equitable relief as a matter of law.

---

[28] Ms. Thompson claimed she "went to People Services and got the salaries of those people in those positions and I averaged them, including burden, which included, you know, taxes and those type of things." *See* T 123:14-17.  Ms. Thompson has never identified which individuals' salaries she reviewed, what those salaries were, and admits no documentation supporting her calculations was produced in discovery.

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW

163.    This Court has long held that:

"The "unclean" hands doctrine relied upon by appellants requires that one who comes into equity must come with "clean hands." *Munzenrieder & Associates, Inc. v. Daigle*, 525 S.W.2d 288, 291 (Tex. Civ. App. -- Beaumont 1975, no writ). This maxim means that a court acting in equity will refuse to grant relief to a plaintiff who has been guilty of unlawful or inequitable conduct with regard to the issue in dispute. *See* 30 C.J.S. *Equity* § 93 (1965). The determination of whether a party has come to court with unclean hands is left to the discretion of the trial court. *Hand v. State*, 335 S.W.2d 410, 419 (Tex. Civ. App. -- Houston), *writ refused n.r.e. per curiam*, 160 Tex. 416, 337 S.W.2d 798 (1960). The doctrine cannot be used as a defense if the unlawful or inequitable conduct of the plaintiff is merely collateral to the plaintiff's cause of action. *See* 27 AM. JUR. 2d *Equity* § 143 (1966). In order to justify application of the doctrine the defendant must show injury suffered as a result of the plaintiff's conduct. *See Omohundro v. Matthews*, 161 Tex. 367, 341 S.W.2d 401, 410 (1960)."

*Sirius Computer Soln's, Inc. v. Sparks*, 138 F. Supp.3d 821, 838 (W.D. Tex. 2015) (*citing Davis v. Grammar*, 750 S.W.2d 766, 768 (Tex. 1988) (*citing Grohn v. Marquardt*, 657 S.W.2d 851, 855 (Tex. App. 4th, 1983))).

### F.    Dwyer's Counterclaims Fail For Lack of Essential Proofs

#### 1.    *There Was No Infringement Under the Lanham Act*

164.    Dwyer's claim fails for two, separate reasons. First, Dwyer failed to establish a likelihood of confusion "in the minds of potential consumers as to the source, affiliation, or sponsorship" between its marks and Predictive's job applicant assessment and processing services at trial. *See Elvis Presley Enters. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998) (*citing Society of Fin. Exam'rs v. National Ass'n of Certified Fraud Exam'rs, Inc.*, 41 F.3d 223, 227 (5th Cir.) cert. denied, 515 U.S. 1103 (1995); *see, also* 15 U.S.C. § 1114(1); § 1125(a)(1)(A). This is fatal to the claim. *Id*. (*citing Soc'y of Fin. Exam'rs*, 41 F.3d at 227). Dwyer could not make even the minimum proof, probability of confusion. *Id*. (*citing Blue Bell Bio-Med v. Cin-Bad, Inc*., 864 F.2d 12253, 1260 (5th Cir. 1989)). Second, Dwyer failed to establish it was damaged by the alleged infringement.

PREDICTIVE'S POST TRIAL
                                                                    PROPOSED FINDINGS
                                                                    OF FACT AND LAW

165.    Dwyer failed to produce evidence that the relevant class of consumers was confused: indeed, it failed to produce evidence that *anyone* was confused by Predictive's allegedly infringing use of its marks.  However, and as this Court knows, identifying the relevant consumers is critical to the inquiry. *Springboards to Educ. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 812-13 (5th Cir. 2019) (*citing Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.* 718 F.2d 1201, 1206 (1st Cir. 1983) ("If likelihood of confusion exists, it must be based on the confusion of some relevant person, *i.e.* a customer or purchaser."))

166.    Applying the "digits of confusion" test favored in the Fifth Circuit, a "non-exhaustive" 7-factor test, it is clear Dwyer failed to meet is burden and must be denied judgment. *See Elvis Presley Enters.*, 141 F.3d at 194 (*citing Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1982). The following "digits" are the classic factors to be considered by the Court: (1) the type of mark allegedly infringed; (2) the similarity between the marks; (3) the similarity of the products or services; (4) the identity of the retail outlets or purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; and (7) any evidence of actual confusion. *Id.*  No one factor is dispositive, and the Court need not find in Dwyer's favor on a majority of factors to find Predictive's conduct infringing – which it is not. *Id.* (*citing Conan Properties*, 752 F.2d. at 150; *Soc'y of Fin. Exam'rs* at 228). Further, the Court is free to consider other, relevant factors in making its determination. *Id.*

a.    The Strength and Similarity of the Marks

167.    Courts have found the use of another's mark in advertising "probative of the reaction of prospective [consumers] to the mark." *Elvis Presley*, 141 F.3d at 197. (*quoting In re Abcor Dev. Corp.*, 588 F.2d 811, 814 (C.C.P.A. 1978)).  In particular, and in connection with service marks, as here, advertising is of greater relevance because the mark is separate from the

service. *Id.* (*citing Restatement (Third) of Unfair Competition*, § 21(a)(i) (1995) (stating "the overall impression created by the [marks] *as they are used in marketing* the respective…services" is relevant to the marks' similarity analysis.) (emphasis in original)). Therefore, Dwyer must establish infringement of its service mark under the Lanham Act, which requires the Court look to "when it is used or displayed in the sale or advertising of services." *Id.* (*quoting* 15 U.S.C. § 1127). Dwyer has not offered evidence which shows Predictive advertising its own services using its Marks.

      b.     <u>There is No Similarity Between Dwyer's Brands and Predictive's Services</u>

168.    "The greater the similarity of the products and services, the greater the likelihood of confusion." *Elvis Presley Enters.*, 141 F.3d at 202 (*quoting Exxon Corp. v. Texas Motor Exch. Of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980)). However, where services are non-competitive, the Court must focus on whether the junior user's use suggests "sponsorship, affiliation, or connection." *Id.* (*citing Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 388 (5th Cir. 1977); 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24:3, :6 (4th Ed. 1997)). The "danger of affiliation or sponsorship increases" where a junior user's services are offered in a market the senior user might naturally expand into. *Id.* (*citing Restatement (Third) of Unfair Competition*, § 21(e) and cmt. j.) Conversely, where the services are dissimilar, the likelihood of confusion decreases accordingly.

169.    In *Kentucky Fried*, plaintiff Kentucky Fried Chicken Corp. ("KFC") sued defendant, an unapproved vendor servicing some of its franchisees, for unfair competition and trademark infringement. The Fifth Circuit, in reviewing *de novo*, noted "the buyers with whom we deal are not the consumer public, but franchisees fully familiar with the corporate configuration underlying the products." *Kentucky Fried*, 549 F.2d at 389. However, and unlike here, the

defendant in *Kentucky Fried* intentionally misled franchisees into believing it was affiliated with, or approved by, KFC: this intentional misleading was the lynch pin in the Fifth Circuit's finding of infringement. *Id*. at 390.

170. Here, then, the Court must be concerned with "consumer perception" is the controlling factor in deciding whether the area of expansion was "natural": if consumers believe the senior user would expand into a given market occupied by the junior user, "confusion may be likely." *Elvis Presley Enters*., 141 .3d at 202 (citations omitted).

c.     <u>Predictive's Use of Dwyer's Marks was Altruistic</u>

171. Proof of the junior user's intent to confuse the public is not needed to establish a likelihood of confusion. *Id.* at 203 (*citing Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 597 (5th Cir. 1985)). However, evidence of good faith adoption of the marks mitigates against finding a likelihood of confusion exists. *Id.* (citing *Fuji Photo*, 754 F.2d at 597-98). That said, if other factors supporting a likelihood of confusion exist, they may "suggest an intent to confuse" even if the junior user subjectively believes it acted in good faith. *Rest. (3d) Unfair Comp*. § 22, cmt. c. The Court should look to whether the junior user took steps to fairly demonstrate it did not intend to confuse its consumers. *Id.* The Fifth Circuit held the defendant's use of significant advertising, "supported an intent to confuse." *Elvis Presley* at 203 (*citation omitted*). Essentially, actions speak louder than words.

d.     <u>Dwyer Has Failed to Establish Actual Confusion</u>

172. Though Dwyer was not required to show actual confusion, it remains "the best evidence of a likelihood of confusion." *Elvis Presley* at 203-04 (*citing Amstar Corp.*, 615 F.2d at 263). The absence of confusion, or minimal confusion over an extended period is strongly suggestive of no actual confusion. *Id.* at 204.; *see Oreck Corp. v. U.S. Floor Sys.*, 803 F.2d 166,

173 (5th Cir. 1986) *superseded by statute as stated in Cottonwood Fin. Ltd. v. Cash Store Fin. Servs.*, 778 F. Supp.2d 726, 748 (N.D. Tex. 2011) (no likelihood of confusion found despite concurrent sales over seventeen months).

173. For the foregoing reasons, Dwyer is not entitled to relief on its claim for trademark infringement because it has failed to establish the factual and legal bases for that relief. The evidence admitted at trial and the applicable law establishes there is not, nor can there be, any likelihood of confusion between Predictive's services and Dwyer's marks. The Court should deny Dwyer's claim for relief on this basis.

e.    Dwyer Has No Damages for the Alleged Infringement

*Dwyer Has No Actual Damages*

174. Dwyer's need to restore its reputation with its own franchisees is *not* what corrective advertising is for, and it is ridiculous to demand more than $2 million to spend on advertising designed to salve Dwyer's self-inflicted wounds (which do not exist). This is not designed to "counteract the public confusion resulting from a defendant's [trademark] infringement," because there **is no public confusion**, there is only ***private distrust by knowledgeable franchisees***. *Clear Choice Holdings, LLC v. Clear Choice Dental, PLLC*, CA No. H-14-03569, 2016 U.S. Dist. LEXIS 183064, *14 (S.D. Tex. Dec. 23, 2016) (*citing Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1374-75 (10th Cir. 1977). Moreover, the prospective, corrective advertising should not be awarded here because to do so would be punitive. *Clear Choice Holdings, LLC* at *15 (court denied award of speculative corrective advertising damages where plaintiff had done no corrective advertising because to award those damages under the circumstances was punitive.)

*The Expert's Testimony Was Not Credible and Should be Discounted*

175.     An expert's testimony must be reliable.  *See Graham v. San Antonio Zoological Society*, 261 F. Supp.3d 711, 727-28 (W.D. Tex. 2017) (*citing Moore v. Ashland Chem., Inc.*, 11 F.3d 269, 276 (5th Cir. 1998)).  The testimony must be reliable "at each and every step" because "[t]he reliability inquiry applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion," and so forth.  *Id.* (*citing Knight v. Kirby Inland Marine Inc.*, 482 R.3d347, 355 (5th Cir 2007)).  "The expert's assurances that he has utilized generally accepted scientific methodology [are] insufficient." *Moore*, 151 F.3d at 276.

176.     Importantly, however, this Court must "approach its task with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *Id.* (*citing United States v. 14.38 Acres of Land, More or Less Sit. in Leflore Cty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (internal quotations omitted)).  As the court in *Moore* held, "[u]nder *Daubert*, "*any* step that renders the analysis unreliable…*renders the expert's testimony inadmissible.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.*'" *Moore v. Ashland Chem., Inc.*, 11 F.3d at 278 n.11 (*citing In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir. 1994) (emphasis in original)).

177.     *Fed. R. Civ. P.* 702 permits an expert to testify where s/he possesses "*scientific*, technical or other specialized *knowledge* [which] *will assist the trier of fact* to understand the evidence or to determine a fact in issue. *Moore v. Ashland Chem., Inc.*, 151 F.3d at 275 (emphasis in original) (*citing Fed. R. Civ. P.* 702).  As the *Moore* court noted, "knowledge connotes more than subjective belief or unsupported speculation."  *Id.*  In order to be considered "scientific knowledge," however, an "inference or assertion must be derived by the scientific method." *Id.*

178.     Per *Fed. R. Civ. P.* 26(a)(2)(B), when disclosing a testifying expert, the disclosure

must "be accompanied by a written report – prepared and signed by the witness."

179.    Dr. North's testimony calls into serious question whether his report was drafted by him, and should give the Court pause because the testimony makes clear Dr. North's opinions are *ipse dixit*, but it is Dwyer and their counsel who have given their say-so, nor North.  *See Kumho Tire Co. Ltd v. Carmichael*, 526 U.S. 137, 157 119 S.Ct. 1167, 1179 (U.S. 1999).

180.    For these reasons, the Court must exclude Dr. North's testimony as unreliable under *Fed. R. Civ. P.* 702 and *Daubert*.

181.    In light of the fact that Dwyer has no actual damages and their expert's testimony is unreliable, the Court must find Dwyer cannot recover on its trademark infringement claim as a matter of law.

### G.    **Unfair competition**

182.    To meet its burden, Dwyer needed to prove: (1) that Predictive made a false statement of fact about its services in a commercial advertisement; (2) that the false statement actually deceived or tended to deceive a substantial segment of its audience; (3) the deceptive statement was material and was likely influence a purchasing decision; (4) Predictive's false statement in its advertising was made in interstate commerce; and (5) Dwyer was injured, or was likely to be injured, as a result of Predictive's false statement. *Deaf Interpreter Servs. v. Webbco Enters., L.L.C.*, No. 5:13-cv-867-RCL, U.S. Dist. LEXIS 181339, *36 (W.D. Tex. Feb. 11, 2015) (*citing York Grp., Inc. v. Horizon Casket Grp., Inc.*, 459 F. Supp.2d 567, 575-76 (S.D. Tex. 2006) (string cite omitted). Dwyer failed to prove any of these elements.

183.    To the extent Dwyer argued the generic "applyatsites" were evidence of unfair competition, that argument fails.  The mere registration of a website which uses an accurate description of the service rendered thereon is not actionable under a theory of unfair competition.

*Deaf Interpreter Serv's* at *39. For example, the registration and use of "www.applyforhvacjobs.com" is neither false nor misleading because it "corresponds to a location on the Internet associated with that domain name." *Id.*; *see, also GoForit Entm't, LLC v. DigiMedia.com L.P.*, 750 F. Supp. 2d 712, 732 (N.D. Tex. 2010) (domain name not literally false because it truly described the internet address of the website)).

184. Dwyer cannot show Predictive's websites "suggest affiliation with or endorsement by the markholder." *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.2d 477, 484 (5th Cir. 2004) (*citing Trail Chevrolet, Inc. v. Gen. Motors Corp.*, 381 F.2d 353, 354 (5th Cir. 1967) (per curiam); *accord Volkswagenwerk Aktiengesellshaft v. Church*, 411 F.3d 2350, 352 (9th Cir. 1969); *see, generally* 41 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 25.43 (4th ed. 2003).

185. As set forth above, during trial no evidence was introduced establishing Predictive competes with Dwyer or its brands, fairly or otherwise. Indeed, Dwyer introduced significant evidence by the testimony of its witnesses that Predictive and Dwyer are *not* competitors. Under these circumstances then, the Court must find there is no unfair competition and deny Dwyer its relief.

### H. Dwyer's Cybersquatting Claim Fails for Lack of Proofs

186. Dwyer made virtually no effort to prove up its claim under Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d). Dwyer was obligated to prove Predictive had: (1) a bad faith intent to profit from the use of Dwyer's mark and (2) registered, trafficked in, or used a domain which is confusingly similar to that mark. *Heritage Alliance v. Am. Policy Roundtable*, No. 1:18-cv-939-RP, U.S. Dist. LEI 122308, *7 (W.D. Tex. July 23, 2019) (*citing Tex. Int'l Prop. Assocs. v. Hoerbiger Holding AG*, 624 F. Supp.2d 582, 587 (N.D. Tex.

2009)); 15 U.S.C. § 1125(d); *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009).

187.    Under the ACPA, this Court may consider a non-exclusive 9-factor test in making this determination. *Tex. Int'l Prop. Assocs.* at 588-89 (*citing TMI, Inc. v. Maxwell*, 368 F.3d 433, 436 (5th Cir. 2004); *see, also* 15 U.S.C. § 1125(d)(1)(B)(i). The Court need not consider all factors. *Id.* at 589. A determination of bad faith should be made on the basis of a "totality of the circumstances." *Id.* (citations omitted). Furthermore, the ACPA contains a "safe harbor" provision under which the Court can find the party "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *Id.* (*quoting* 15 U.S.C. § 1125(d)(1)(B)(ii) That the content on these websites utilizes some of Dwyer's word marks is of no moment in this analysis.  Even if the Court finds the *domains* confusingly similar, which they are not, Dwyer's motion fails because there is no bad intent on Predictive's part in registering the allegedly-infringing domains.

188.    As set forth above and established at trial, Predictive had a good faith basis for using Dwyer's marks on its generic domains: the service of the Contractors.  This was permitted not only by Dwyer – who repeatedly testified at trial the Contactors were free to use Predictive's services – but also by this Court's Order (P36.)

189.    Therefore, the Court should find Dwyer has failed to meet its burden under the law and deny them relief.

## I.      <u>Dwyer is Not Entitled to Permanent Injunctive Relief</u>

190.    To obtain a permanent injunction, Dwyer was obligated to prove not only that its rights were infringed upon, but also that it will suffer irreparable harm absent injunctive relief. *See, e.g. Seven-Up Co. v. Coca-Cola*, 86 F.3d at 1390 (*citing McNeill-P.C.C., Inc. v. Bristol-Myers*

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW

*Squibb, Co.*, 938 F.2d 1544, 1548-49 (2d Cir. 1991)). Dwyer failed to meet both burdens because, as set forth above, Dwyer failed to: establish the existence of a likelihood of confusion between its marks and Predictive's services; establish Predictive is, in any way, competing with it (much less competing unfairly); establish Predictive acted wrongfully in registering its generic domains to provide services to the Contractors; and, finally, establish ***any*** damages it suffered or will suffer as a result of these non-actionable events.

191.     Dr. North's testimony and report, to the extent this Court assigns them any weight whatsoever (which it ought not do for the reasons set forth above) did not address any irreparable harms which might befall Dwyer absent injunctive relief.  Dr. North was not retained to opine on that subject, and Dwyer may not rely upon him after the fact.

192.     As a practical matter, there is no longer any activity which this Court need enjoin: Predictive is no longer operating any job portals for Dwyer franchisees as a result of this Court's Order [Dkt. No. 970.

193.     For these reasons then, Dwyer is not entitled to a permanent injunction, as there is no proof of infringement, and no past or continuing irreparable harm to be enjoined.  Likewise, there is no indication in the record that Dwyer need be protected from some future, irreparable harm.  The Court should deny Dwyer's permanent injunction.


## CONCLUSION

Wherefore, premises presented, Predictive respectfully requests this Court enter judgment in its favor on its affirmative claims for Breach of Contract, Tortious Interference with Contract, and Tortious Interference with Prospective Contract and award damages as follows:

- $328,900 in actual damages;

- $3, 644,000 in lost profits

- Its attorneys' fees and costs of litigation, to be supplied in an affidavit of services at the Court's request.

Predictive further respectfully requests the Court find in its favor and DENY judgment to ProTradeNet and Dwyer on each of their respective claims for the reasons set forth at length herein. Predictive also respectfully requests this Court, as part of its Order of Judgment, award to Predictive its attorney's fees and costs associated with these claims, subject to submission of an affidavit of services, together with any and all other such relief as the Court deems equitable and just under the totality of the circumstances.

Respectfully submitted by:

**NAMAN HOWELL SMITH & LEE, PLLC**

By: /s/ *Jordan Mayfield*
Jordan Mayfield
State Bar No. 24037051
Robert Little
State Bar No. 24050940
400 Austin Ave., Suite 800
Waco, Texas 76701
Tel: (254) 755-4207
Fax: (254) 754-6331
mayfield@namanhowell.com
little@namanhowell.com

Justin M. Klein
*Admitted Pro Hac Vice*
**MARKS & KLEIN, LLP**
63 Riverside Avenue
Red Bank, New Jersey 07701
Telephone: (732) 747-7100
Facsimile: (732) 219-0625
justin@marksklein.com

*Attorneys for Defendant/Counterclaimant*
*Predictive Profiles Incorporated*

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

James R. Dunnam, Esq.
Dunnam & Dunnam, LLP
4125 W. Waco Drive
Waco, Texas, 79710

By: /s/ *Jordan Mayfield*
Jordan Mayfield

PREDICTIVE'S POST TRIAL
PROPOSED FINDINGS
OF FACT AND LAW